# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CENTRAL CALIFORNIA ENVIRONMENTAL JUSTICE NETWORK, a nonprofit corporation, COMMITTEE FOR A BETTER ARVIN, a nonprofit corporation, MEDICAL ADVOCATES FOR HEALTHY AIR, a nonprofit organization, and SIERRA CLUB, a nonprofit corporation;<br><br>     Petitioners,<br><br>  vs.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency, and MICHAEL MARTUCCI, in his official capacity as Acting Regional Administrator for Region IX of the U.S. Environmental Protection Agency,<br><br>     Respondents. | No.<br><br>**PETITION FOR REVIEW**<br><br>Agency No. EPA-R09-OAR-2024-0338 |

Pursuant to section 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1), and Rule 15(a) of the Federal Rules of Appellate Procedure, Central California Environmental Justice Network, Committee for a Better Arvin, Medical Advocates for Healthy Air, and Sierra Club petition this Court for review of the final rule entitled "Conditional Approval; Contingency Measure State Implementation Plan for the 2008 Ozone Standards; San Joaquin Valley, California." Respondents U.S. Environmental Protection Agency, Lee Zeldin, and Michael Martucci published the final rule in the *Federal Register* on June 4, 2026 at 91 Fed. Reg. 33618 (June 4, 2026), attached as Exhibit 1.

Respectfully submitted this 30th day of July, 2026.

LAW OFFICE OF BRENT J. NEWELL

/s/ Brent J. Newell
BRENT J. NEWELL, California Bar No. 210312
LAW OFFICE OF BRENT J. NEWELL
245 Kentucky Street, Suite A4
Petaluma, CA 94952
(661) 586-3724
brent@lawofficenewell.com

Attorney for Petitioners Central California Environmental Justice Network, Committee for a Better Arvin, Medical Advocates for Healthy Air, and Sierra Club

1

PETITION FOR REVIEW

## CERTIFICATE OF SERVICE FOR ELECTRONIC FILING

I hereby certify that I caused to be electronically filed the **Petition for Review** on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Case Management System. I certify that I caused to be served the foregoing document on this date by Certified Mail to the following unregistered case participants:

Lee Zeldin, Administrator
U.S. Environmental Protection
   Agency
Office of the Administrator
Mail Code: 1101A
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Michael Martucci
Acting Regional Administrator,
Region 9
U.S. Environmental Protection
   Agency
Mail Code ORA-1
75 Hawthorne Street
San Francisco, CA 94105

Sean Donahue
General Counsel
U.S. Environmental Protection
   Agency
Office of General Counsel
Mail Code: 2310A
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Todd Blanche
Acting Attorney General of the
United States
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Craig H. Missakian
United States Attorney for the
Northern District of California
c/o Civil Process Clerk
United States Attorney's Office for
the Northern District of California
450 Golden Gate Avenue, Box
36055
San Francisco, CA 94102

Adam R.F. Gustafson
Principal Deputy Assistant Attorney
General
Environment & Natural Resources
   Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

2

I certify under penalty of perjury that the foregoing is true and correct.  Executed on July 30, 2026 in Petaluma, California.

s/ Brent J. Newell

PETITION FOR REVIEW

# Exhibit 1

set of these comments is provided in the docket for this final action.

## IV. Final Action

The EPA is approving the changes to the DOEE's title V permit program codified in 20 DCMR Chapter 3. The revisions meet the relevant requirements of section 502 of the CAA and 40 CFR 70.4 and 70.9.

## V. Statutory and Executive Order Reviews

Under the Clean Air Act, the Administrator is required to approve a SIP submission that complies with the provisions of the Clean Air Act and applicable Federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, the EPA's role is to approve State choices, provided that they meet the criteria of the Clean Air Act. Accordingly, this action merely approves State law as meeting Federal requirements and does not impose additional requirements beyond those imposed by State law. For that reason, this action:

• Is not a significant regulatory action subject to review by the Office of Management and Budget under Executive Order 12866 (58 FR 51735, October 4, 1993);

• Is not an Executive Order 14192 (90 FR 9065, February 6, 2025) regulatory action because this action is not significant under Executive Order 12866;

• Does not impose an information collection burden under the provisions of the Paperwork Reduction Act (44 U.S.C. 3501 *et seq.*);

• Is certified as not having a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*);

• Does not contain any unfunded mandate or significantly or uniquely affect small governments, as described in the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4);

• Does not have federalism implications as specified in Executive Order 13132 (64 FR 43255, August 10, 1999);

• Is not subject to Executive Order 13045 (62 FR 19885, April 23, 1997) because it approves a State program;

• Is not a significant regulatory action subject to Executive Order 13211 (66 FR 28355, May 22, 2001); and

• Is not subject to requirements of section 12(d) of the National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) because application of those requirements would be inconsistent with the Clean Air Act.

In addition, the SIP is not approved to apply on any Indian reservation land or in any other area where the EPA or an Indian Tribe has demonstrated that a Tribe has jurisdiction. In those areas of Indian country, the rule does not have Tribal implications and will not impose substantial direct costs on Tribal governments or preempt Tribal law as specified by Executive Order 13175 (65 FR 67249, November 9, 2000).

This action is subject to the Congressional Review Act, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2).

Under section 307(b)(1) of the Clean Air Act, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by August 3, 2026. Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this action for the purposes of judicial review nor does it extend the time within which a petition for judicial review may be filed and shall not postpone the effectiveness of such rule or action. This action to approve the revisions to the DC title V program revision may not be challenged later in proceedings to enforce its requirements. (See section 307(b)(2).)

## List of Subjects in 40 CFR Part 70

Environmental protection, Administrative practice and procedure, Air pollution control, Carbon monoxide Intergovernmental relations, Lead, Nitrogen dioxide, Ozone, Particulate matter, Reporting and recordkeeping requirements, Sulfur oxides, Volatile organic compounds.

**Amy Van Blarcom-Lackey,**
*Regional Administrator, Region III.*

For the reasons stated in the preamble, the EPA amends 40 CFR part 70 as follows:

## PART 70—STATE OPERATING PERMIT PROGRAMS

■ 1. The authority citation for part 70 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

■ 2. Appendix A to part 70 is amended by adding paragraph (e) under ''District of Columbia'' to read as follows:

## Appendix A to Part 70—Approval Status of State and Local Operating Permit Programs

\* \* \* \* \*

District of Columbia

\* \* \* \* \*

(e) The District of Columbia submitted a program revision on May 30, 2024 to update the title V operating permit fees collected by the DOEE; approval effective on June 4, 2026.

\* \* \* \* \*

[FR Doc. 2026–11170 Filed 6–3–26; 8:45 am]
**BILLING CODE 6560–50–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 52

[EPA–R09–OAR–2024–0338; FRL–12118–04–R9]

### Conditional Approval; Contingency Measure State Implementation Plan for the 2008 Ozone Standards; San Joaquin Valley, California

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is taking final action to conditionally approve a state implementation plan (SIP) submission under the Clean Air Act (CAA or ''Act'') that addresses the contingency measure requirements for the 2008 ozone national ambient air quality standards (NAAQS or ''standards'') for the San Joaquin Valley ozone nonattainment area. The SIP submission, titled the ''Ozone Contingency Measure State Implementation Plan Revision for the 2008 and 2015 8-hour Ozone Standards'' (''2024 SJV Ozone Contingency Measure Plan,'' ''Contingency Measure Plan,'' or ''Plan'') relies on two ozone contingency measures that the EPA has already approved in separate rulemakings. The approval is conditional because it relies on commitments by the State air agency and regional air district to supplement the 2024 SJV Ozone Contingency Measure Plan with submission of specific additional contingency measures within one year of the EPA's final conditional approval. The EPA is taking final conditional approval action of the SIP submission because the Agency has determined that the existing approved contingency measures, the commitments to submit additional contingency measures, and the justification for not adopting contingency measures that would achieve the recommended amount for such measures, meet the applicable requirements for such SIP submissions for the San Joaquin Valley for the 2008 ozone NAAQS. This conditional approval adds the 2024 SJV Ozone Contingency Measure Plan to the federally enforceable California SIP.


AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

**Federal Register**/Vol. 91, No. 107/Thursday, June 4, 2026/Rules and Regulations **33619**

**DATES:** This rule is effective July 6, 2026.

**ADDRESSES:** The EPA has established a docket for this action under Docket ID No. EPA–R09–OAR–2024–0338. All documents in the docket are listed on the *https://www.regulations.gov* website. Although listed in the index, some information is not publicly available, *e.g.,* Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available through *https://www.regulations.gov,* or please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section for additional availability information. If you need assistance in a language other than English or if you are a person with a disability who needs a reasonable accommodation at no cost to you, please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section.

**FOR FURTHER INFORMATION CONTACT:**
Andrew Ledezma, Air Planning Office (ARD–2), EPA Region IX, 75 Hawthorne Street, San Francisco, CA 94105, telephone number: (415) 972–3985, or by email at *ledezma.andrew@epa.gov.*

**SUPPLEMENTARY INFORMATION:**
Throughout this document, ''we,'' ''us,'' and ''our'' refer to the EPA.

**Table of Contents**

I. Summary of Proposed Action
II. Public Comments and EPA Responses
III. EPA Action
IV. Statutory and Executive Order Reviews

**I. Summary of Proposed Action**

On October 25, 2024 (89 FR 85119) (herein, ''proposed rule''), the EPA proposed to conditionally approve California's contingency measure SIP submission for the 2008 ozone NAAQS submitted by the California Air Resources Board (CARB) for the San Joaquin Valley nonattainment area in California. Specifically, we proposed to conditionally approve the ''Ozone Contingency Measure State Implementation Plan Revision for the 2008 and 2015 8-hour Ozone Standards (April 25, 2024)'' (herein referred to as the ''2024 SJV Ozone Contingency Measure Plan,'' ''Contingency Measure Plan,'' or ''Plan'') as it pertains to the 2008 ozone NAAQS. CARB submitted the 2024 SJV Ozone Contingency Measure Plan on April 29, 2024,[1] as a revision to the California SIP.

The 2024 SJV Ozone Contingency Measure Plan relies on two specific contingency measures that the EPA has previously approved and includes commitments to adopt five additional contingency measures. The previously-approved contingency measures include a contingency for the vehicle inspection and maintenance (''Smog Check'') program, referred to herein as CARB's ''Smog Check Contingency Measure,'' and amendments to the San Joaquin Valley Unified Air Pollution Control District's (SJVUAPCD's or ''District's'') architectural coatings rule (District Rule 4601) to include a contingency measure for the 2008 ozone NAAQS (''Architectural Coatings Contingency Measure'').[2] The commitments for additional contingency measures relate to further amendments to District Rule 4601 (Architectural Coatings) (''Architectural Coatings Rule'') and amendments to District Rule 4603 (Surface Coating of Metal Parts and Products, Plastic Parts and Products, and Pleasure Crafts) (''Surface Coating of Metal Parts and Products Rule''), District Rule 4604 (Can and Coil Coating Operations) (''Can and Coil Coatings Rule''), District Rule 4653 (Adhesives and Sealants) (''Adhesives and Sealants Rule'') and District Rule 4663 (Organic Solvent Cleaning, Storage, and Disposal) (''Solvent Cleaning Rule'').

On the same day we published our proposed conditional approval of the 2024 SJV Ozone Contingency Measure Plan, we issued an interim final determination that California had submitted revisions to the California SIP that correct the deficiency that had prompted the partial disapproval of previous SIP submissions addressing contingency measure requirements for the 2008 ozone NAAQS in San Joaquin Valley.[3] Our interim final determination was based on the proposed conditional approval that we are finalizing in this action. The effect of the interim final determination is to stay the application of the offset sanction and to defer the application of the highway sanction that

were triggered by the EPA's previous partial disapproval.

We proposed to conditionally approve the 2024 SJV Ozone Contingency Measure Plan because we preliminarily determined that the two approved contingency measures, the five contingency measures to which the District commits to adopt, and the justifications by the District and CARB for not adopting additional contingency measures collectively satisfy the contingency measure SIP requirements of CAA sections 172(c)(9) and 182(c)(9) for San Joaquin Valley for the 2008 ozone NAAQS. We proposed a conditional approval, as authorized under CAA section 110(k)(4), based on commitments by the District and CARB to adopt and submit the five additional contingency measures within one year of the conditional approval of the Plan.[4]

In section I of the proposed rule, we presented background information on the ozone NAAQS,[5] the nonattainment designations and classifications of the San Joaquin Valley for the 2008 ozone NAAQS, and the resultant contingency measure SIP obligations, and we summarized our prior contingency measure (partial) disapproval for the San Joaquin Valley for the 2008 ozone NAAQS.[6] In section II of the proposed rule, we summarized the contingency measure SIP requirements under the CAA, relevant EPA guidance, and legal precedent, including a brief discussion of relevant decisions by the Ninth Circuit Court of Appeals[7] and the D.C. Circuit Court of Appeals.[8]

In addition, we described the EPA's long-standing approach to contingency

---

[1] CARB adopted the 2024 SJV Ozone Contingency Measure Plan as a SIP revision on April 26, 2024,

through CARB Executive Order S–24–2003, and submitted the SIP revision to the EPA electronically on April 29, 2024, as an attachment in a letter dated April 26, 2024, from Steven S. Cliff, Ph.D., Executive Officer, CARB to Martha Guzman, Regional Administrator, EPA Region IX.

[2] 89 FR 56222 (July 9, 2024) (final approval of Smog Check Contingency Measure). The Architectural Coatings Contingency Measure is included in the District's Rule 4601. The EPA approved the Architectural Coatings Contingency Measure at 87 FR 78544 (December 22, 2022).

[3] 89 FR 85064 (October 25, 2024). Our partial disapproval of previous SIP submissions addressing the contingency measure requirements for the San Joaquin Valley for the 2008 ozone NAAQS was published at 87 FR 59688 (October 3, 2022).

---

[4] Letter from Samir Sheikh, Executive Director/Air Pollution Control Officer, SJVUAPCD, to Dr. Steven S. Cliff, Executive Officer, CARB, and Martha Guzman, Regional Administrator, EPA Region IX, dated June 18, 2024; and letter from Michael Benjamin, D. Env., Division Chief, Air Quality Planning & Science Division, CARB, to Martha Guzman, Regional Administrator, EPA Region IX, dated June 24, 2024.

[5] Ground-level ozone pollution is formed from the reaction of volatile organic compounds (VOC) and oxides of nitrogen ($NO_X$) in the presence of sunlight. These two pollutants, referred to as ozone precursors by many types of sources, including on-and off-road motor vehicles and engines, power plants and industrial facilities, and smaller area sources such as lawn and garden equipment, architectural coatings, and other types of consumer products. This action relates to the 8-hour-average ozone NAAQS that the EPA established in 2008 and that is referred to as the ''2008 ozone NAAQS'' or ''2008 ozone standard.'' We also refer herein to the ozone NAAQS that the EPA established in 1997 (the ''1997 ozone NAAQS'') and in 2015 (the ''2015 ozone NAAQS'').

[6] 87 FR 59688 (October 3, 2022).

[7] *Bahr* v. *EPA,* 836 F.3d 1218, 1235–1237 (9th Cir. 2016) and *Association of Irritated Residents* v. *EPA,* 10 F.4th 937, 946–47 (9th Cir. 2021) (''*AIR* v. *EPA*'' or ''*AIR*'').

[8] *Sierra Club* v. *EPA,* 21 F.4th 815, 827–828 (D.C. Cir. 2021).

**33620** **Federal Register** / Vol. 91, No. 107 / Thursday, June 4, 2026 / Rules and Regulations

measures and the EPA's revised approach for addressing the contingency measure SIP requirements, as presented in the EPA's draft guidance, entitled ''Draft: Guidance on the Preparation of State Implementation Plan Provisions that Address the Nonattainment Area Contingency Measure Requirements for Ozone and Particulate Matter (DRAFT—3/17/23—Public Review Version),'' herein referred to as the ''Draft Revised Contingency Measures Guidance.'' [9] Two principal differences between the draft revised guidance and the previous guidance on contingency measures relate to the EPA's recommendations concerning the specific amount of emission reductions that implementation of contingency measures should achieve [10] and the timing for when the emission reductions from the contingency measures should occur. The Draft Revised Contingency Measures Guidance also provides recommended procedures for developing a demonstration, if applicable, that the area lacks sufficient feasible measures to achieve one year's worth (OYW) of emissions reductions, building on existing guidance that the state should provide a reasoned justification for why the smaller amount of emissions reductions is appropriate.

Since publication of the proposed rule, the EPA has issued Final Revised Contingency Measures Guidance.[11] The Final Revised Contingency Measures Guidance carries forward the same basic principles included in the Draft Revised Contingency Measures Guidance. In this document, where the context does not warrant a distinction between the Draft and Final Revised Contingency Measures Guidance, we use the term ''Revised Contingency Measures Guidance.''

In section III of the proposed rule, we described in general terms the SIP submission that is the subject of this rulemaking and evaluated how the District and CARB complied with the procedural requirements for adopting SIP revisions. The District and CARB

adopted the 2024 SJV Ozone Contingency Measure Plan to respond to the EPA's partial disapproval of the previous contingency measure SIP submissions for San Joaquin Valley for the 2008 ozone NAAQS and to address the contingency measure SIP requirements for San Joaquin Valley for the 2015 ozone NAAQS. We specified that our proposed conditional approval action relates only to the 2024 SJV Ozone Contingency Measure Plan as it pertains to the 2008 ozone NAAQS.

In sections IV and V of the proposed rule, we provided a detailed summary of the 2024 SJV Ozone Contingency Measure Plan and discussed how the District and CARB had applied the revised approach to fulfilling the contingency measure SIP requirement in the context of the 2008 ozone NAAQS in the San Joaquin Valley, and we presented our evaluation thereof. Specifically, we discussed our evaluation of the District's and CARB's identification and evaluation of potential control measures, adoption of certain contingency measures, comparison of those contingency measures against OYW of emissions reductions, and reasoned justification for not adopting further contingency measures, which we summarize in the following paragraphs.

In the 2024 SJV Ozone Contingency Measure Plan, the District described its ongoing stationary source regulatory efforts, identified potential control measures as candidate contingency measures, and analyzed the technological and/or economic feasibility of each candidate measure, including the feasibility of implementing such measures within 60 days and achieving the resulting emission reductions within one to two years of the triggering event.[12] The District also provided more in-depth analysis of potential contingency measures for certain specific source categories, including biosolids, animal manure, and poultry litter operations; confined animal facilities; architectural coatings; surface coating of metal parts and products; can and coil coating operations; aerospace assembly and component coating operations; adhesives and sealants; organic solvent cleaning; polyester resin operations; and wine fermentation and storage tanks.[13] Ultimately, the District adopted commitments to adopt contingency

measures for five source categories [14] and provided a justification in the form of an infeasibility demonstration for not adopting contingency measures for the other source categories.

Similarly, CARB identified potential mobile source control measures, assessed whether each candidate measure could be implemented within 60 days of a triggering event and achieve emission reductions within one to two years, and then analyzed their technological and/or economic feasibility.[15] Regarding timing of emission reductions from mobile sources, CARB concluded that new engine standards and fleet regulations are not appropriate for contingency measures given the time needed for manufacturers to design, develop, and deploy cleaner engines or equipment at scale, especially for zero-emission equipment.

As noted previously, the 2024 SJV Ozone Contingency Measure Plan relies on two contingency measures that were previously adopted by the District or CARB and approved by the EPA, including the District's Architectural Coatings Contingency Measure and CARB's Smog Check Contingency Measure. The District assessed how the emission reductions from these previously-adopted contingency measures would compare against OYW of progress as defined in the Revised Contingency Measures Guidance.[16] As part of our evaluation and for the proposed rule, we prepared an independent assessment of the emission reductions from the previously adopted and approved contingency measures. In our proposed rule, we found that the two contingency measures, if triggered, would provide approximately two percent of OYW of progress for $NO_X$ and approximately 19 percent of OYW for VOC.[17]

The 2024 SJV Ozone Contingency Measure Plan provides for five additional contingency measures that the District and CARB have committed to adopt and submit within one year of the EPA's conditional approval of the

---

[9] 88 FR 17571 (March 23, 2023) (notice of availability of the EPA's Draft Revised Contingency Measures Guidance).

[10] The EPA's long-standing recommendation was that states should adopt contingency measures sufficient to provide emission reductions equivalent to one year's worth (OYW) of reasonable further progress (RFP). In the Revised Contingency Measures Guidance, the EPA recommends a different amount that contingency measures should achieve—one that is defined in terms of OYW of ''progress'' rather than OYW of RFP. See, e.g., the EPA's Final Revised Contingency Measures Guidance at page 23.

[11] 89 FR 101602 (December 16, 2024) (notice of availability of final guidance, herein referred to as the EPA's ''Final Revised Contingency Measures Guidance'').

[12] 2024 SJV Ozone Contingency Measure Plan, p. 18.

[13] 2024 SJV Ozone Contingency Measure Plan, section 5.12 (''Further Evaluation of Specific Categories'').

[14] The District's commitments to adopt contingency measures relate to the following source categories: architectural coatings, surface coating of metal parts and products, can and coil coating operations, adhesives and sealants and organic solvent cleaning.

[15] 2024 SJV Ozone Contingency Measure Plan, section 5.11 (''CARB Reactive Organic Gases Area Source Measure Analysis'') and 2024 SJV Ozone Contingency Measure Plan, appendix B (''California Smog Check Contingency Measure State Implementation Plan Revision''), specifically, appendix A (''Infeasibility Analysis'') to the Smog Check Contingency Measure SIP.

[16] 2024 SJV Ozone Contingency Measure Plan, pp. 89–90.

[17] 89 FR 85119, 85129 (October 25, 2024).

Plan, but the Plan does not include emissions estimates for the five additional contingency measures. These additional contingency measures would increase the overall amount of reductions of VOC from contingency measures under the Plan but would be unlikely to collectively provide for OYW of progress for that ozone precursor.

Because the estimated $NO_X$ and VOC emission reductions from the contingency measures fall short of OYW of progress, CARB and the District documented their control measure analyses across the wide range of source categories under each agency's respective jurisdiction (*e.g.,* on-road sources, off-road sources, stationary point sources, and area sources) to demonstrate that adoption of additional contingency measures would be infeasible. We described the District's and CARB's infeasibility demonstrations, and our evaluation thereof, in detail in the proposed rule and proposed to find that they adequately justify the contingency measures selected by CARB and the District for the 2008 ozone NAAQS in the San Joaquin Valley. In light of the two adopted contingency measures and five committal contingency measures, and reasoned justifications for not adopting additional contingency measures, we proposed to approve the 2024 SJV Ozone Contingency Measure Plan as meeting the contingency measure requirements of CAA sections 172(c)(9) and 182(c)(9) for the 2008 ozone NAAQS in the San Joaquin Valley.

Since publication of the proposed rule, the EPA determined that the San Joaquin Valley failed to attain the 1997 ozone NAAQS by the applicable attainment date.[18] That determination triggered the Smog Check Contingency Measure, which was submitted as a contingency measure for multiple NAAQS, including the 1997 and 2008 ozone NAAQS, in San Joaquin Valley.

Under the current California Smog Check program, certain vehicles are exempt from the biennial inspection requirement, including vehicles eight or fewer model years old. Upon the EPA's determination of failure to attain, the Smog Check Contingency Measure reduced this exemption to vehicles seven or fewer model years old in the San Joaquin Valley.

As approved into the SIP, the Smog Check Contingency Measure provides for a second triggering event, and thus, the Smog Check Contingency Measure continues to be available as a

contingency measure for the 2008 ozone NAAQS in the San Joaquin Valley. Upon a second triggering event, the Smog Check Contingency Measure would further reduce the exemption from vehicles seven or fewer model years old to vehicles six or fewer model years old in the San Joaquin Valley.

We would expect a similar number of motor vehicles to be affected upon a second triggering event as are affected upon the first triggering event, and thus, we also expect a similar level of emissions impact from a second triggering event as has been estimated for the first triggering event. As such, the emissions reduction estimates from implementation of the Smog Check Contingency Measure that we relied upon for our evaluation of the 2024 SJV Ozone Contingency Measure Plan and that were based on a first triggering event continue to be valid for use in our final action on the Plan notwithstanding the occurrence of the first triggering event.

Please see our October 25, 2024 proposed rule (89 FR 85119) for more information on the 2024 SJV Ozone Contingency Measure Plan and our evaluation of the Plan for compliance with the applicable CAA requirements.

## II. Public Comments and EPA Responses

The EPA's proposed action provided a 30-day public comment period. During this period, we received comment letters from three organizations or groups and two individuals. CARB and the District submitted letters supporting the EPA's proposed action and related interim final determination.[19] The individuals' comments also support the EPA's proposed action and related interim final determination. A group of four environmental, public health, and community organizations in the San Joaquin Valley (collectively, referred to herein as the "Valley Environmental Organizations") submitted comments objecting to our proposed action.[20] In

the following paragraphs, we summarize the comments objecting to our proposed action and provide our responses.

*Comment 1:* The Valley Environmental Organizations assert that the EPA's proposed approval of the 2024 SJV Ozone Contingency Measure Plan departs from the EPA's long-standing interpretation requiring OYW of reasonable further progress (RFP). They further state that the proposed approval based on the Revised Contingency Measures Guidance violates CAA section 172(c)(9) by severing the amount of required emission reductions from the parallel and related RFP requirement when the EPA shifts from its OYW of RFP to its new OYW of progress interpretation. The Valley Environmental Organizations further assert that the plain meaning does not allow, and the EPA cannot provide a reasoned justification for, an interpretation that requires less than that which the Act requires for RFP and that here, the ozone contingency measures plainly provide reductions far less than OYW of RFP.

*Response to Comment 1:* Regarding emissions reduction metrics (*i.e.,* the recommended amount of emissions reductions that contingency measures should achieve), we disagree with commenters as to what is required under the CAA and with the commenters' broader framing of contingency measures within the overall planning requirements for nonattainment areas. While there is a statutory link between RFP and the contingency measure requirements of CAA sections 172(c)(9) and 182(c)(9), it does not function as the commenter suggests (*i.e.,* to establish an amount of emission reductions that contingency measures should achieve).

CAA section 172(c)(9) ("Contingency measures") requires states to adopt SIP revisions for nonattainment areas that provide for the implementation of specific measures to be undertaken if the area fails to make RFP, or to attain

---

[18] 90 FR 46065 (September 25, 2025).

[19] Letter dated November 22, 2024, from Edie Chang, Deputy Executive Officer, CARB, to Martha Guzman, Regional Administrator, EPA Region IX; and letter dated November 23, 2024, from Samir Sheikh, Executive Director/Air Pollution Control Officer, SJVUAPCD, to EPA Docket Center.

[20] Letter dated November 25, 2024, from the Central California Environmental Justice Network, Committee for a Better Arvin, Medical Advocates for Healthy Air, and Sierra Club, to Andrew Ledezma, Air and Radiation Division, EPA Region IX, including 13 exhibits. The Valley Environmental Organizations indicated that they were submitting comments on the proposed approval of the 2024 SJV Ozone Contingency Measure Plan (as it pertains to the 2008 ozone NAAQS), the Smog Check Contingency Measure, and the Architectural Coatings Contingency Measure. In our October 25, 2024 proposed rule, we

proposed action only on the 2024 SJV Ozone Contingency Measure Plan. We recognize that the 2024 SJV Ozone Contingency Measure Plan relies on the Smog Check Contingency Measure and the Architectural Coatings Measure, but we proposed and finalized approval of the individual contingency measures separately from our rulemaking on the 2024 SJV Ozone Contingency Measure Plan. See 88 FR 87981 (December 20, 2023) and 89 FR 56222 (July 9, 2024) (proposed and final approval of the Smog Check Contingency Measure); and see 87 FR 57161 (September 19, 2022) and 87 FR 78544 (December 22, 2022) (proposed and final approval of Architectural Coatings Contingency Measure). We are not reconsidering our approvals of the two contingency measures through our rulemaking on the 2024 SJV Ozone Contingency Measure Plan.

the national primary ambient air quality standard by the attainment date. Section 172(c)(9) also specifies that such measures must be included in the SIP revision as contingency measures to take effect in any such case without further action by the state or the EPA. CAA section 182(c)(9) ("Contingency provisions") applies to ozone nonattainment areas classified as Serious or higher, and it extends the contingency measure requirements under CAA section 172(c)(9) to failures to meet any applicable milestone.

Thus, while section 172(c)(9) requires contingency measures where an area fails to make RFP, the language does not specify what amount of emission reductions such measures should achieve (*i.e.,* does not explicitly tie the amount of reductions to RFP). Similarly, while section 182(c)(9) requires contingency measures where an area fails to meet any applicable milestone (which in turn is a discrete measure of RFP), the language similarly does not specify what amount of emission reductions such measures should achieve. Moreover, the statutory text also has a link to attainment, but it too does not specify what amount of emission reductions contingency measures should achieve.

While Congress did not specify an amount that contingency measures must achieve to comply with CAA sections 172(c)(9) and 182(c)(9), Congress must have intended the amount to be material because, without a specified amount, a state would not know how to comply with the requirement. Thus Congress must have at least implicitly delegated to the EPA the authority to determine an amount of emissions reductions that contingency measures should achieve and thereby give meaning to the requirement and provide states with a basis to comply with CAA sections 172(c)(9) and 182(c)(9) for a given nonattainment area.

The EPA has taken a policy approach to this question, and in the past, the EPA has indicated that the recommended amount is OYW of RFP but allowed states to provide a reasoned justification for adopting contingency measures that would provide less than the recommended amount. Under the Revised Contingency Measures Guidance, the EPA continues to take a policy approach but recommends OYW of progress (rather than OYW of RFP) and provides a specific analytical framework that states may use to develop a reasoned justification if the state is unable to identify and adopt contingency measures that can achieve

the recommended amount of emissions reductions.[21]

In support of our revised approach, we first note that, for both RFP and attainment purposes, contingency measures are intended to provide for continued progress in the event that an area fails to meet an RFP milestone or fails to attain the NAAQS by the applicable attainment date. Contingency measures are not themselves expected to provide for either RFP or attainment. With respect to RFP, the CAA provides certain remedies if the contingency measures do not make up the shortfall for a given RFP milestone.[22] With respect to a failure to attain by the applicable attainment date, the CAA too provides a remedy by requiring a new attainment plan.[23]

In reviewing our long-standing approach to contingency measures, the EPA observed that basing the amount of emission reductions on the annual amount of reductions needed to meet the separate RFP requirement—OYW of RFP—may in some cases lead to an amount that is greater than what typically would be needed to make up for a shortfall in RFP or for attainment purposes.[24] The OYW of RFP approach was unnecessarily conservative for estimating the amount of emission reductions needed for contingency measure purposes because a given percentage of the base year inventory tends to represent a much more significant portion of the attainment projected inventory.

In shifting to the OYW of progress approach, the EPA recognizes attainment of the NAAQS by the applicable attainment date as the primary objective of the nonattainment plan requirements (including the RFP requirement), and thus, the appropriate

metric should be attainment-focused.[25] In the absence of a CAA-specified amount of emission reductions required for contingency measures, the EPA's new approach is a better reading of the contingency measure SIP requirement given our understanding of the statutory purpose of contingency measures following a failure to meet an RFP milestone or to attain, which is to ensure uninterrupted progress toward attainment while the next steps unfold in response to the failure. In addition, for ozone, the recommended percentage of reductions represents appropriate progress toward attainment as opposed to a fixed amount. The annual rate of reductions (*i.e.,* the percentage) could be more or less than three percent, depending on the amount of reductions necessary to demonstrate attainment, and states should perform this calculation for both ozone precursors, VOC and $NO_X$.

Moreover, unlike the previous approach, the EPA's new approach takes into account the declining emissions inventories between the base year and attainment year for a given nonattainment area and aligns the metric for determining the amount of emissions reductions that contingency measures should achieve for ozone and particulate matter (PM). The alignment between ozone and PM is a better reading of the statute considering that the relevant statutory provision, CAA section 172(c)(9), applies to all the NAAQS.[26]

As to the specific SIP submission addressed in this document, we acknowledge that CARB and the District used the newly-recommended metric in preparing the 2024 SJV Ozone Contingency Measure Plan for which the EPA is now finalizing conditional approval but, in this instance, the SIP submission and the EPA's evaluation thereof would have been the same in substance if the previous metric (*i.e.,* OYW of RFP) had been used instead. This is because, using either metric, the SIP submission relies on previously approved contingency measures that collectively provide for less than OYW of progress or RFP for both ozone precursors. The only difference is the extent to which the emission reductions

---

[21] OYW of RFP is calculated differently for ozone and particular matter (PM). For ozone, annual RFP is essentially defined as three percent of the base year emissions inventory (EI). For PM, annual RFP is the average annual reductions between the base year EI and the projected attainment year EI (*i.e.,* the projected attainment inventory for the nonattainment area). In contrast, OYW of progress is calculated the same way for ozone and PM: by determining the average annual reductions between the base year EI and the projected attainment year EI, determining what percentage of the base year EI this amount represents, then applying that percentage to the projected attainment year EI to determine the amount of reductions needed to ensure ongoing progress if contingency measures are triggered. See also 88 FR 87988, 87994, the EPA's Draft Revised Contingency Measures Guidance, pp. 21–23, and the EPA's Final Revised Contingency Measures Guidance, pp. 23–27.

[22] See CAA sections 182(g)(3) and 189(c)(3).

[23] See CAA section 179(d).

[24] EPA's Draft Revised Contingency Measures Guidance, pp. 21–23. See also the EPA's Final Revised Contingency Measures Guidance, pp. 23–27.

[25] CAA section 171(1) defines RFP as such annual incremental reductions in emissions of the relevant pollutant as are required under part D (of title I of the CAA) or may reasonably be required by the EPA *for the purpose of ensuring attainment of the applicable NAAQS by the applicable attainment date.* (emphasis added)

[26] The provisions of CAA section 182(c)(9) for Serious and above ozone nonattainment areas are similar to the section 172(c)(9) requirements except that the focus is on meeting emissions reductions milestones (CAA section 182(g)).

from the contingency measures fall short of each metric. Using the OYW of progress metric, the contingency measures are estimated to achieve approximately 19 percent and 2 percent of OYW of progress for VOC and $NO_X$, respectively, as compared to approximately 4 percent of OYW of RFP using the previously-recommended metric.[27] Using either metric, the EPA would have expected the State to provide a reasoned justification for not adopting contingency measures sufficient to achieve greater VOC and $NO_X$ emission reductions. Consistent with the EPA's recommendations in the Revised Contingency Measures Guidance, CARB and the District provided a reasoned justification in their infeasibility demonstrations.

*Comment 2:* The Valley Environmental Organizations assert that the EPA's proposed approval of the 2024 SJV Ozone Contingency Measure Plan circumvents three recent court decisions[28] and unlawfully and arbitrarily a) lowers the amount of emission reductions required for contingency measures ("by severing the statutory link to [RFP]," *i.e.,* by shifting from OYW of RFP under the EPA's prior interpretation to OYW of progress under the EPA's revised interpretation), b) extends implementation of contingency measures from one year to two years, and c) invents a new feasibility exemption that does not appear in CAA section 172(c)(9).[29] The commenters state that the EPA's proposed approval relies on the Revised Contingency Measures Guidance "to replicate the arbitrary and capricious interpretation the [*AIR*] court invalidated."[30]

*Response to Comment 2:* In relevant part, the *Bahr* and *Sierra Club* decisions stand for the proposition that contingency measures under CAA section 172(c)(9) must be conditional and prospective, and thus, already-implemented control measures cannot serve as contingency measures. The *AIR* decision stands for the proposition that

surplus emission reductions from already-implemented measures cannot be relied upon as a justification for adoption of contingency measures that provide for less than the recommended amount of emission reductions for such measures. However, none of the cited court decisions bear on the questions of the amount of emission reductions that contingency measures must achieve to comply with the CAA, the timeline for achieving the emission reductions from contingency measures, or the consideration of infeasibility as justification for not adopting contingency measures sufficient to achieve the recommended amount of such measures.

Moreover, our proposed approval of the 2024 SJV Ozone Contingency Measure Plan is consistent with the three cited decisions in that the SIP relies on two contingency measures (Architectural Coatings Contingency Measure and the Smog Check Contingency Measure) that are designed to be conditional and prospective. In addition, as discussed further in the following paragraph, the State has not relied on emission reductions from already-implemented measures.

The rationale for our approval of the 2024 SJV Ozone Contingency Measure Plan is not the same as the rationale for our approval, later withdrawn in response to the *AIR* decision, of the contingency measure element for the San Joaquin Valley for the 2008 ozone NAAQS that was at issue in the *AIR* case. In the case of the contingency measure element for the 2008 ozone NAAQS, the EPA took into account the surplus emission reductions from already-implemented measures in the milestone years and the years following the attainment date, not as constituting contingency measures per se, but rather, as justification for approving a contingency measure element that included a single contingency measure that would provide for far less than the recommended amount.

The Court found that, by doing so, the EPA had "severed the relationship between the requirement of contingency measures and the benchmark of reasonable further progress, without an adequate explanation of why the new—and far more modest—contingency measure is reasonable."[31] The Court did not indicate that the Agency could not depart from previous guidance but cautioned that the EPA "must give a reasoned explanation for departing from agency practice or policy."[32] The Court concluded that "[I]f already-

implemented measures cannot themselves be contingency measures—and *Bahr* makes clear that they cannot—then neither can they be a basis for declining to establish contingency measures that would otherwise be appropriate."[33] The Court rejected the EPA's rationale for allowing consideration of surplus emission reductions from already-implemented measures, reasoning that the EPA could not approve a contingency measure element "lacking robust contingency measures by assuming that they will not be needed. Because the agency did not provide a reasoned explanation for approving the state plan, the rule is arbitrary and capricious."[34]

In the wake of the *Sierra Club* and *AIR* decisions, the EPA undertook an internal process to reconsider previous guidance provided by the Agency to states for preparation of SIP submissions to meet the contingency measure requirements—a process that led to the publication of the Revised Contingency Measures Guidance. Among other things, in the Revised Contingency Measures Guidance, the EPA explains why the Agency believes that it is appropriate to update its prior guidance with respect to the recommended amount of emission reductions that contingency measures should achieve and the considerations that states could use to justify adoption of contingency measures that do not provide for the recommended amount of emission reductions.[35] We found that an update to our contingency measures guidance was justified in light of changed factual circumstances[36] and a current understanding of what remaining controls may be available for states to adopt as contingency measures. For a more detailed explanation of our rationale for updating the metric, see

---

[27] The estimate of approximately 4 percent of OYW of RFP is based on estimated reductions of 0.355 tpd of VOC and 0.079 tpd of $NO_X$ from contingency measures and estimates of OYW of RFP of 11.4 tpd of VOC and 11.3 tpd of $NO_X$, which represent 3 percent of the baseline emissions estimates for 2011 of 378.7 tpd of VOC and 375.6 tpd of $NO_X$. See 83 FR 61346, 61353 (November 29, 2018) (proposed approval of RFP demonstration for San Joaquin Valley for the 2008 ozone NAAQS); finalized at 84 FR 11198 (March 25, 2019).

[28] The commenter cites *Bahr* v. *EPA,* 836 F.3d 1218 (9th Cir. 2016) ("*Bahr*"); *Sierra Club* v. *EPA,* 21 F.4th 815 (D.C. Cir. 2021) ("*Sierra Club*"); *AIR* v. *EPA,* 10 F.4th 937 (9th Cir. 2021) ("*AIR*").

[29] Valley Environmental Organizations Letter, pp. 12 and 14.

[30] Valley Environmental Organizations Letter, p.14.

[31] *AIR* v. *EPA,* 10 F.4th 937, 946 (9th Cir. 2021).

[32] Id.

[33] Id.

[34] Id. at 947.

[35] EPA's Draft Revised Contingency Measures Guidance, pp. 21–28 (revised metric) and pp. 29–40 (reasoned justification for adoption of contingency measures that provide for less than the recommended amount of emission reductions). See also the EPA's Final Revised Contingency Measures Guidance, pp. 23–33 (revised metric) and pp. 33–45 (reasoned justification for adoption of contingency measures that provide for less than the recommended amount of emission reductions).

[36] By "changed circumstances," we are referring to court decisions that have invalidated key aspects of EPA's historical approach to implementing the contingency measure requirement and the evolution toward more stringent control programs in the 30 years since the EPA first articulated its contingency measures guidance. As described in Response to Comment 3, the progressively stringent control measures adopted to meet prior attainment and RFP planning requirements are already implemented measures and therefore ineligible to serve as contingency measures, resulting in a narrowing pool of candidate contingency measures.

**33624** **Federal Register** / Vol. 91, No. 107 / Thursday, June 4, 2026 / Rules and Regulations

Response to Comment 1, and for a more detailed explanation for allowing for consideration of feasibility, see Response to Comment 4.

With respect to this action, CARB and the District have adopted a contingency measure element that relies on two contingency measures that would not collectively achieve the recommended amount of emission reductions for the two precursors at issue (VOC and $NO_X$), and they have provided a reasoned justification in the form of infeasibility demonstrations for adopting contingency measures that provide for less than the recommended amount. The EPA's approval of a contingency measure element that relies, in part, on CARB and the District's infeasibility demonstrations, rather than relying on surplus emission reductions from already-implemented measures, stands in contrast to the EPA action on the SIP submission at issue in *AIR.* The EPA does not assume that contingency measures would not be needed for San Joaquin Valley but, rather, that CARB and the District have adequately demonstrated that there are no feasible contingency measures for VOC or $NO_X$ that are left to adopt or that could be implemented within one to two years of the triggering event.

*Comment 3:* For areas with more severe air pollution, such as Extreme ozone nonattainment areas, the commenters state that the EPA has not articulated a reasoned justification for why OYW of progress is consistent with the CAA remedial scheme that imposes more stringent requirements on such areas. They suggest that a voluntary reclassification of an area (*e.g.,* from Serious to Extreme for ozone) would lower the average annual reductions needed for contingency measures (*e.g.,* if the same attainment year inventory applied for a Serious or Extreme areas, then the annual average reduction would be lower due to averaging over more years).

In addition, the commenters illustrate a purported fatal flaw in the EPA's interpretation of OYW of progress using a table that shows OYW of progress for $NO_X$ in a hypothetical ozone reclassification from Serious to Extreme (in tons per day of $NO_X$) and state that a lesser amount of emission reductions for contingency measures for such hypothetical Extreme ozone nonattainment area runs contrary to the structure of the Act.

*Response to Comment 3:* As explained in more detail in our Response to Comment 1, with respect to this specific action, the reliance on the new OYW of progress metric (rather than the previously-recommended metric of

OYW of RFP) does not materially impact our approval because the 2024 SJV Ozone Contingency Measure Plan falls short of the emissions reductions recommended under either metric. However, we note that, contrary to commenters' assertions, the EPA's interpretation of the contingency measure requirement under CAA sections 172(c)(9) and 182(c) is consistent with the CAA's general scheme of subjecting areas with higher classifications to more stringent requirements. More specifically, the increased stringency relates to the types of measures that qualify as contingency measures rather than the amount of emissions reductions that such measures must achieve.

Under the EPA's interpretation of the contingency measure requirement, contingency measures must be designed to provide emissions reductions (if triggered) that are not otherwise required to meet other attainment plan requirements and not relied upon to demonstrate RFP or attainment. Thus, for example, contingency measures in ozone nonattainment areas classified as Serious, which must require implementation of Reasonably Available Control Technology (RACT) for all stationary sources that emit, or have the potential to emit, 50 tons per year or more of VOC or $NO_X$, must be measures that go beyond the RACT requirement whereas contingency measures in ozone nonattainment areas classified as Extreme (for which the threshold for the RACT requirement is 10 tons per year) must be measures that go beyond the more stringent RACT requirement.[37] In other words, reclassification of an area to a higher classification shrinks the pool of candidate contingency measures because some of the candidate contingency measures will be required to be adopted and implemented in the reclassified area to meet the specific control requirements for that classification and, thus, will be unavailable for adoption as contingency measures. The candidate contingency measures that remain eligible to meet the contingency measures SIP requirement under the higher classification are more stringent than those that had been available to meet the requirement under the lower classification. While more stringent measures would achieve further emission reductions, if triggered, they may achieve a smaller scale of emission reductions than the prior iterations of increasingly stringent control measures on a given emission source; stringency

(a relative measure) is not the same as tons per day of emission reductions (an absolute measure).

Regarding the commenters' assertion that areas with more severe air pollution should have contingency measures that achieve a larger amount of emissions reductions (*i.e.,* one year's worth of RFP), we look once more to the broader framing of contingency measures within the overall planning requirements for nonattainment areas. The EPA finds that the statutory and regulatory requirements to demonstrate attainment as expeditiously as practicable, and the absence of a specific statutory metric for how much emissions reductions contingency measures should achieve, give priority to adopting control measures to attain in the first place, even if that leaves fewer options for contingency measures in the event of a failure to attain or to make RFP.

In the 2024 SJV Ozone Contingency Measure Plan, CARB and the District elaborate further on using an attainment-focused metric by highlighting the scarcity of potential control measures that would qualify as contingency measures given the facts and circumstances of the San Joaquin Valley,[38] where the progressively stringent set of control measures adopted to meet prior attainment and RFP planning requirements are already implemented measures and therefore ineligible to serve as contingency measures.[39] This scarcity concept echoes the tension between the CAA requirements for attainment and contingency measures and the prioritization of adopting measures to attain in the first place. Nonetheless, the EPA does not endorse the scarcity concept as a starting point but rather recommends the detailed analytical approach to identifying and evaluating potential control measures that can serve as contingency measures, as described in the Revised Contingency Measures Guidance and that CARB and the District employed in developing the 2024 SJV Ozone Contingency Measure Plan.

Regarding the commenters' suggestion that a State could reduce the amount of emissions reductions needed for contingency measures by requesting a

---

[37] CAA sections 182(b)(2)(C), 182(c), 182(e) and 182(f).

[38] 2024 SJV Ozone Contingency Measure Plan, section 4.1 (''Stringency of District and CARB's Regulatory Program'') and appendix B (''California Smog Check Contingency Measure State Implementation Plan Revision''), section 2 (''CARB's Opportunities for Contingency Measures'').

[39] 2024 SJV Ozone Contingency Measure Plan, appendix B (''California Smog Check Contingency Measure State Implementation Plan Revision''), section 2 (''CARB's Opportunities for Contingency Measures'').

voluntary reclassification that would extend the amount of time to attain while relying on the same level of emissions reductions, we disagree that such an action runs contrary to the general remedial scheme of the CAA that imposes more stringent requirements on reclassified areas.[40] In support of our conclusion in this regard, we have reviewed the commenter's hypothetical scenario purportedly illustrating a fatal flaw in the OYW of progress metric and disagree that it shows that the OYW of progress metric runs contrary to the structure of the CAA. The scenario compares two ozone areas, one is a Serious nonattainment area and the other is an Extreme ozone nonattainment area, and assumes that each area has base year emissions of 200 tons per day (tpd) and requires emissions reductions of 100 tpd to attain. The Serious area has a maximum of 9 years to attain, whereas the Extreme area has a maximum of 20 years to attain. The commenter estimates OYW of progress at 5.7 tpd for the Serious area and 2.5 tpd for the Extreme area and asserts that the structure of the CAA would suggest that the Extreme area should be subject to a greater burden to achieve emissions reductions as compared to the lower classified area, not a lesser burden.[41]

While the EPA is generally required to approve voluntary reclassification requests (for ozone areas), and reclassifications do provide for a greater timeline for attainment, there is no guarantee that the EPA will approve an attainment demonstration that provides for attainment by the maximum allowable attainment date. This is because the CAA and the EPA's regulations require states to provide for

attainment "as expeditiously as practicable" but no later than the maximum allowable attainment date.

Thus, under this scenario, we must assume that the nine years represents "expeditious attainment" for the Serious area, whereas 20 years represents "expeditious attainment" for the Extreme area. As such, the Serious area has identified control measures sufficient to achieve approximately 11.12 tpd reduction on an annual basis over the nine-year period from the base year to the attainment year. In contrast, the Extreme area has identified control measures sufficient to achieve approximately 5 tpd reduction on an annual basis over the 20-year period.

This suggests that the Serious area has a greater number of feasible control measures available to adopt and, in the event of a failure to attain, that a higher burden to continue that rate of progress after the attainment year is appropriate. Conversely, the Extreme area would appear to have fewer feasible options available and, in the event of a failure to attain, that a lower burden (compared to the Serious area) to maintain the lower rate of progress after the attainment year is also appropriate. For these reasons, we do not agree that the scenario provided by the commenter shows that our revised interpretation, as set forth in the Revised Contingency Measures Guidance, of the amount of emissions reductions that states should achieve to meet the CAA's contingency measure SIP requirement runs contrary to the structure of the CAA.

For these reasons, as well as those described in Response to Comment 1 of this document, we conclude that the EPA's revised metric for contingency measure emission reductions (OYW of progress) does not run contrary to the general remedial scheme of the CAA that imposes more stringent requirements on areas reclassified to a higher classification.

*Comment 4:* Regarding feasibility assessments, the Valley Environmental Organizations state that the CAA does not subject the contingency measure requirements to a feasibility standard and reject the State's and the EPA's proposed reliance on infeasibility demonstrations. The commenters argue that Congress made no exceptions to the contingency measure requirements, nor did it provide authority to relax those requirements based on technological or economic challenges. They state that the CAA requirements for reasonably available control measures (RACM) or RACT include a "reasonably available" qualifier and that those for most stringent measures (MSM) are expressly limited to "feasible" measures, while

such terms do not appear in the CAA requirements for contingency measures. They contend that the EPA conflates the contingency measure requirements with the primary requirements to attain the NAAQS in the first place. They further state that Congress expressly provided limited authority to relax the CAA requirements for RFP but did not do so for contingency measures.

The commenters state that the RACM requirements (under CAA sections 172(c)(1), 182(b)(2)) require that the primary attainment strategy include "all" RACM and other available control measures that would expedite attainment and that the MSM provision (for $PM_{2.5}$ nonattainment areas) requires additional control measure implementation. They argue that contingency measures should not comprise the same controls that the CAA already requires for attainment and that failed to attain the NAAQS in the first place and that the EPA unlawfully and arbitrarily excuses contingency measures needed when the feasible measures the State has already adopted result in a failure to attain the NAAQS (citing *AIR,* 10 F.4th at 946).

Given these alleged flaws in the EPA's interpretation, the commenters state that the EPA's proposed approval violates the plain meaning of the CAA contingency measure requirement, fails to reasonably explain the Agency's relaxation of the emission reductions that contingency measures must provide, and is therefore arbitrary and capricious.

*Response to Comment 4:* As discussed in Response to Comment 1, Congress must have at least implicitly delegated to the EPA the authority to determine an amount of emissions reductions that contingency measures should achieve and thereby give meaning to the requirement and provide states with a basis to comply with CAA section 172(c)(9) for a given nonattainment area. The EPA continues to take a policy approach to this question and recommends OYW of progress (rather than OYW of RFP) and provides a specific analytical framework that states may use to develop a reasoned justification if the state is unable to identify and adopt contingency measures that can achieve the recommended amount of emissions reductions. More specifically, as stated in our proposed rule and the EPA's Revised Contingency Measures Guidance, where a state is unable to identify contingency measures that would provide approximately OYW of emission reductions, the state should provide a reasoned justification (referred to herein as an "infeasibility

---

[40] We further note that a voluntary reclassification would result in stationary sources in the area being subject to more stringent (lower) permitting thresholds and lower applicability thresholds for Reasonably Available Control Technology (RACT) requirements.

[41] For comparison purposes, under the commenter's scenario, the previously-recommended metric of OYW of RFP for both the Serious and Extreme ozone areas would be 6.0 tpd of VOC, although $NO_X$ could be substituted for VOC on an equivalent percentage basis. Under the Revised Contingency Measures Guidance, the contingency measures for the Serious ozone area should provide for OYW of progress for VOCs in addition to the 5.7 tpd of $NO_X$. For the Extreme area, the comparison is between 6.0 tpd of VOC (under the previously-recommended metric of OYW of RFP) and 2.5 tpd of $NO_X$, but again, under the Revised Contingency Measures Guidance, the recommended amount of reductions would include both OYW of VOC in addition to the 2.5 tpd of $NO_X$. The comparison illustrates that the EPA's newly-recommended metric does not, in all instances, lessen the burden on states to comply with the contingency measure requirement, let alone eviscerate the requirement, as asserted by the commenters.

demonstration'') that explains and documents how it has evaluated all existing and potential control measures relevant to the appropriate source categories and pollutants in the nonattainment area and has reached reasonable conclusions regarding whether such measures are feasible.[42] Thus, while the EPA acknowledges that CAA section 172(c)(9) does not explicitly provide for consideration of whether specific measures are feasible, the EPA does not read the statute to require air agencies to adopt and impose infeasible measures.[43]

As stated in the proposed rule, the statutory provisions applicable to other nonattainment area plan control measure requirements, including RACM/RACT, best available control measures/best available control technology (BACM/BACT), and MSM, allow air agencies to exclude certain control measures that are deemed unreasonable or infeasible (depending on the requirement).[44] For example, the MSM provision in CAA section 188(e) requires plans to include ''the most stringent measures that are included in the implementation plan of any state or are achieved in practice in any state, and can feasibly be implemented in the area.'' While the contingency measures provisions do not include such caveats, the EPA does not conclude that the contingency measures provisions should be read to require plans to include infeasible measures. Thus, the EPA anticipates that a demonstrated lack of feasible measures would be a reasoned justification for adopting contingency measures that achieve less than the recommended amount of emission reductions.[45]

The EPA does not, as the commenters suggest, simply conflate the contingency measure requirements with other control requirements (e.g., RACM/RACT, BACM/BACT, and MSM) that are integral to demonstrating attainment of the ozone and/or PM$_{2.5}$ NAAQS. Rather, while the analytical approach to identifying and evaluating existing and potential control measures may be similar to those used for RACM/RACT, BACM/BACT, and MSM (e.g., identifying the universe of control devices that can reduce NO$_X$ emissions from combustion equipment and whether they are technologically and economically feasible as applied to a specific type of emissions source in the area), the EPA expects that the state ''should not simply repeat the control strategy's infeasibility showing.'' [46] The contingency measure requirement is in addition to the other control measure requirements.

A conclusion that a measure is not reasonable or feasible, for example, for RACM does not automatically disqualify it as a potential contingency measure. If the state identifies control measures that it determines are not needed to attain nor to collectively advance attainment, those measures would not be required to satisfy the RACM requirement but would remain as candidates for contingency measures. To the extent that the adopted contingency measures achieve a small amount of emission reductions, the state should provide a more robust infeasibility showing that there are no additional feasible contingency measures that could achieve the recommended amount of reductions.[47] Furthermore, to the extent that the state's analyses and development of contingency measures occur after the state's analyses and development of the SIP submissions to meet the attainment control strategy

requirements of the CAA (including associated control requirements and RFP), the state should update their analyses to reflect the latest potential control measures.

In the case of the 2024 SJV Ozone Contingency Measure Plan, CARB and the District documented their analyses to identify and evaluate potential control measures that might serve as contingency measures. These analyses are updated relative to their 2023 submission of the SJV PM$_{2.5}$ Contingency Measure SIP, the 2021 submission of the Serious area attainment plan for the 1997 annual PM$_{2.5}$ NAAQS, the 2019 submissions of the Serious area attainment plan for the 1997 24-hour PM$_{2.5}$ NAAQS (including BACM demonstration), Serious area plan for the 2006 24-hour PM$_{2.5}$ NAAQS (including demonstrations for BACM and MSM), Moderate area plan for the 2012 annual PM$_{2.5}$ NAAQS (including RACM demonstration), and 2016 submission of the attainment plan for the 2008 ozone NAAQS (including the RACM demonstration). The EPA has approved these contingency measure plans and attainment plan control strategies in successive actions [48] and they represent an overall stringent set of control requirements. The State did not set aside measures because they are not available to collectively advance attainment (as might be possible in theory, e.g., for RACM for an ozone nonattainment area).

In their updated analyses, CARB and the District considered the wide range of emissions sources under their primary jurisdiction, identified potential control measures, analyzed their technological and economic feasibility, and assessed whether they could achieve emissions reductions within one to two years of a triggering event, consistent with the EPA's discussion of the timing objective inherent to the contingency measure requirement.[49] For the potential control measures identified through this

---

[42] 89 FR 85119, 85123 (October 25, 2024) and EPA's Draft Revised Contingency Measures Guidance, p. 29. See also the EPA's Final Revised Contingency Measures Guidance, p. 33.

[43] Id.

[44] Id. RACM/RACT requirements are set forth at CAA sections 172(c)(1) (applicable to nonattainment areas for all the NAAQS), 182(b)(2) (specific RACT requirements for ozone nonattainment areas), 189(a)(1)(C) (specific RACM requirements for PM nonattainment areas). BACM/BACT requirements are set forth in CAA section 189(b)(1)(B) (Serious PM nonattainment areas), and MSM requirements are set forth in CAA section 188(e) (certain PM nonattainment areas).

[45] Moreover, we note that contingency measures under CAA section 172(c)(9), once triggered, are generally permanent and become one of the baseline control measures for the next milestone demonstration or the new attainment plan that must be adopted and submitted by the state for an area that has failed to attain the NAAQS by the applicable attainment date. As noted in this document, technological and economic feasibility is a hallmark of such control measures. In contrast, CAA section 110(a)(2)(G) requires states to adopt and submit contingency plans to address emergency episodes as part of their SIPs, and the contingency plans for emergency episodes identify emission

control actions to be taken at different episode levels, which are much higher than the NAAQS, without consideration of economic or technological feasibility. See, generally, 40 CFR 51.150–51.152 and appendix L to 40 CFR part 51. One significant difference, however, between the emission control actions for emergency episode plans under CAA section 110(a)(2)(G) and the control measures relied upon for RFP and attainment is that the former are temporary and are implemented only while the emergency episode persists whereas the latter are, as noted, permanent controls for the area.

[46] EPA's Draft Revised Contingency Measures Guidance, p. 31. At p. 36, the EPA's Final Revised Contingency Measures Guidance states: ''The EPA expects that justifications establishing that control measures evaluated as potential CMs are infeasible could be similar to analyses evaluating the feasibility of the measures to meet other CAA requirements such as RACM/RACT, but should not simply repeat the prior infeasibility showing.''

[47] EPA's Draft Revised Contingency Measures Guidance, p. 31. See also the EPA's Final Revised Contingency Measures Guidance, p. 37.

[48] 89 FR 80749 (October 4, 2024) (approving the SJV PM$_{2.5}$ Contingency Measure SIP); 88 FR 86581 (December 14, 2023) (approving the State's demonstrations for BACM and five percent annual emission reductions under CAA section 189(d) for the 1997 annual PM$_{2.5}$ NAAQS); 87 FR 4503 (January 28, 2022) (approving the State's BACM demonstration for the 1997 24-hour PM$_{2.5}$ NAAQS); 85 FR 44192 (July 22, 2020) (approving the State's demonstrations for BACM and MSM for the 2006 24-hour PM$_{2.5}$ NAAQS); and 84 FR 3302 (February 12, 2019) (approving the RACM demonstration for the 2008 ozone NAAQS).

[49] 89 FR 85119, 85127–85129 (October 25, 2024) (summary of District's and State's feasibility analyses), and 85130–85134 (the EPA's evaluation of the State's feasibility analyses). See also Draft Revised Contingency Measures Guidance, pp. 40–42 and Final Revised Contingency Measures Guidance, pp. 45–48.

process, the District further analyzed possible contingency measures for biosolids, animal manure, and poultry litter operations; confined animal facilities; architectural coatings; surface coating of metal parts and products, plastic parts and products, and pleasure crafts; can and coil coating operations; aerospace assembly and component coating operations; adhesives and sealants; organic solvent cleaning, storage, and disposal; polyester resin operations; and wine fermentation and storage tanks. The District ultimately adopted commitments for contingency provisions related to architectural coatings, surface coating of metal parts and products, can and coil coatings, adhesives and sealants, and solvent cleaning.[50] These additional contingency measures will supplement the two existing approved contingency measures: the District's Architectural Coatings Contingency Measure and CARB's Smog Check Contingency Measure.

CARB, in turn, made a reasonable case that new engine standards and new fleet requirements require more time to implement than would be appropriate for contingency measures (*i.e.,* would exceed one to two years after a triggering event) and that the State's technology-forcing nature of its mobile source regulations reduce or eliminate opportunities for yet-further emission reductions that could qualify as contingency measures.[51] In contrast to new engine standards and new fleet requirements, CARB's feasibility evaluation for in-use motor vehicles led to the identification and adoption of the Smog Check Contingency Measure, which the EPA has approved as part of the California SIP.

The two approved contingency measures and commitments for five additional contingency measures stand in contrast to the commenters' argument that the feasibility assessment process put forward in the EPA's Revised Contingency Measures Guidance, in the State's 2024 SJV Ozone Contingency Measure Plan, and the EPA's proposed conditional approval thereof would simply re-employ the control measures originally employed to attain the ozone and PM$_{2.5}$ NAAQS in the San Joaquin Valley.

Furthermore, in many instances the reason for which the EPA agreed with the State for not adopting a potential control measure as a contingency measure was not based on any affirmation that a measure was

economically infeasible, but rather it was based on other reasons. For example, for the potential control measure of requiring electric water heaters and furnaces at point of sale, the EPA determined that such a measure would not be feasible because we expect that it would result in negligible emission reductions within two years after trigger, consistent with the District's suggestion that the attrition-based nature of implementation of this contingency measure option deems the measure infeasible.[52]

For the potential control measure of lower NO$_X$ emissions limits on oil and gas production equipment with a total rated heat input of greater than 5.0 million Btu per hour, the EPA determined that it would be technologically infeasible to meet the lower limits within the two-year timeframe for contingency measures due to the likely requirement that affected units would need to install selective catalytic reduction (SCR) devices to meet the lower limits (*i.e.,* the planning, engineering, and installation of SCR would take more than two years).[53] Similarly, for the potential control measure of lower NO$_X$ emission limits for boilers, steam generators, and process heaters with a total rated heat input of 5.0 million Btu per hour or less, the EPA expects that units required to meet lower limits than those already adopted in Rules 4307 and 4308 would require installation of SCR, which cannot be feasibly achieved within the two-year timeframe for contingency measures.[54]

In sum, the EPA maintains that it does not read the statute to require air agencies to adopt and impose infeasible measures. Furthermore, as applied to the 2024 SJV Ozone Contingency Measure Plan, we continue to find that the District's and State's two existing contingency measures for the San Joaquin Valley for the 2008 ozone NAAQS, in conjunction with the District's and State's commitments to adopt and submit five additional contingency measures and the District's and State's infeasibility demonstrations that adequately justify the contingency measures selected by the District and State, meet the contingency measure requirements under CAA sections 172(c)(9) and 182(c)(9).

*Comment 5:* The Valley Environmental Organizations assert that the EPA unlawfully and arbitrarily

proposes approval of the 2024 SJV Ozone Contingency Measure Plan based on the Agency's new interpretation in the Revised Contingency Measures Guidance by extending the implementation period from one year to two years.

*Response to Comment 5:* With respect to the issue of extending the period in which the emissions reductions from contingency measures can be considered in meeting the contingency measure SIP requirement, we note that the commenters raise this particular objection to the EPA's proposed approval in a single sentence and fail to elaborate on how extending the time period for achieving the emission reductions from contingency measures from one to two years conflicts with the CAA.

In this instance, we proposed conditional approval of the 2024 SJV Ozone Contingency Measure Plan, which relies on two approved contingency measures (the District's Architectural Coatings Contingency Measure and CARB's Smog Check Contingency Measure) and commitments to adopt and submit five additional contingency measures. The District's Architectural Coatings Contingency Measure is designed to be implemented within 60 days of a triggering event, but architectural coatings sold, supplied, or offered for sale prior to that time in a container with a volume of one liter or less may be applied after that time so long as the coating complied with the standards in effect at the time the coating was manufactured.[55] Nonetheless, we would generally expect the full emissions reductions estimated for the Architectural Coatings Contingency Measure to be achieved within a year of the triggering event.

As explained in the EPA's final rule on CARB's Smog Check Contingency Measure, the emission reductions from the Smog Check Contingency Measure may not be fully achieved until the second year after the triggering event.[56] However, as further explained in that final rule, and consistent with the Revised Contingency Measures Guidance, in instances where there are insufficient contingency measures available to achieve the recommended amount of emission reductions within one year of the triggering event, contingency measures that provide reductions within two years of the triggering event could be appropriate to consider toward achieving the recommended amount of emission

---

[50] 2024 SJV Ozone Contingency Measure Plan, sections 5.12 and 6.
[51] 89 FR 85119, 85133–85134 (October 25, 2024).

[52] 89 FR 85119, 85132 (October 25, 2024), and EPA's Reasoned Justification TSD, pp. 43–51.
[53] 89 FR 85119, 85132 (October 25, 2024), and EPA's Reasoned Justification TSD, pp. 9–22.
[54] 89 FR 85119, 85132 (October 25, 2024), and EPA's Reasoned Justification TSD, pp. 9–22.

[55] District Rule 4601, sections 4.2, 4.3 and 5.3.
[56] 89 FR 56222, 56224–56225 (July 9, 2024).

reductions.[57] Contingency measures that result in additional emissions reductions during the second year following the triggering event, as contemplated by the Revised Contingency Measures Guidance, can still serve the important purpose of contingency measures to continue progress toward attainment, as the State develops and submits, and the EPA acts on, a SIP submission to address the underlying condition (*e.g.,* failure to make RFP or to attain by the applicable attainment date) that triggered the contingency measures in the first place.[58]

*Comment 6:* The Valley Environmental Organizations state that the EPA unlawfully and arbitrarily proposes to approve the 2024 SJV Ozone Contingency Measure Plan even though it relies on a contingency measure (CARB's Smog Check Contingency Measure) that provides for only two triggering events yet serves as a contingency measure for multiple NAAQS without requiring supplementation of the SIP with additional contingency measures. The Valley Environmental Organizations contend that such approval by the EPA unlawfully and arbitrarily allows California discretion in adopting further contingency measures and fails to evaluate whether the emission reductions to follow a second triggering event would meet either OYW of RFP or OYW of progress.

*Response to Comment 6:* Our approval relates to the SIP requirements for contingency measures under CAA sections 172(c)(9) and 182(c)(9) for the 2008 ozone NAAQS. Under the applicable requirements, states with ozone nonattainment areas classified as Serious and above must provide contingency measures that can be triggered in the event of a failure to meet any RFP milestone or to attain the 2008 ozone NAAQS by the applicable attainment date.

Neither the CAA nor the EPA's regulations specify a minimum number of contingency measures or prescribe separate contingency measures for different contingency measure triggers. The CAA and the EPA's regulations also do not preclude the reliance on the same contingency measures for separate NAAQS, and the commenter does not identify any specific statutory or regulatory requirement that does so. Moreover, it is not uncommon for a state or district to rely on a core set of control

measures for multiple NAAQS. For example, the State and District rely on a core set of NO$_X$ control measures as part of the control strategies for demonstrating RFP and attainment for both ozone and PM$_{2.5}$ in the San Joaquin Valley. Regardless, we acknowledge that neither the State nor District has submitted an enforceable commitment to submit additional contingency measures in response to the triggering of the contingency measures. The EPA does not believe that such commitment is required.

In this instance, the 2024 SJV Ozone Contingency Measure Plan relies on two approved contingency measures, only one of which (CARB's Smog Check Contingency Measure) provides for a second triggering event and relates to NAAQS in addition to the 2008 ozone NAAQS.[59] Unlike the District's Architectural Coatings Contingency Measure, CARB's Smog Check Contingency Measure relates to multiple ozone and PM$_{2.5}$ NAAQS but is structured so as to provide not just for implementation of more stringent requirements upon a first triggering event, but also to provide for implementation of yet more stringent requirements upon a second triggering event (*i.e.,* further tightening of the requirements beyond that triggered by the first event). As described previously in this document, the Smog Check Contingency Measure has been triggered once but remains viable for the 2008 ozone NAAQS because it is structured to provide for a second triggering event.

If the Smog Check Contingency Measure were to be triggered a second time, then it would no longer be available as a contingency measure for the 2008 ozone NAAQS. In that event, we would expect CARB and the District to update their feasibility evaluations and adopt and submit a remedial SIP revision within one year of the triggering event. We would also expect the SIP revision to take into account the emission reductions from the remaining contingency measures (the Architectural Coatings Contingency Measure and

additional contingency measures that the District has committed to adopt) and to include any additional feasible contingency measures as needed to ensure that the San Joaquin Valley continues to meet the contingency measure requirements of CAA sections 172(c)(9) and 182(c)(9) for the 2008 ozone NAAQS.

*Comment 7:* The Valley Environmental Organizations contend that the proposed approval of the 2024 SJV Ozone Contingency Measure Plan violates CAA section 110(l). According to the commenters, this is because approval of a contingency measure element that plainly does not provide for OYW of RFP weakens the amount of reductions required by contingency measure elements and, thereby, constitutes unlawful backsliding under CAA section 110(l). In the alternative, the commenters assert that the EPA has unlawfully and arbitrarily failed to consider and make a finding with respect to whether the approval of the 2024 SJV Ozone Contingency Measure Plan constitutes illegal backsliding.

*Response to Comment 7:* CAA section 110(l) prohibits the EPA from approving a SIP revision if it would interfere with any applicable requirement concerning attainment and RFP progress or any other applicable requirement of the Act.

The EPA acknowledges that the Agency did not make any specific determination with respect to CAA section 110(l) in evaluating the 2024 SJV Ozone Contingency Measure Plan. This is because the 2024 SJV Ozone Contingency Measure Plan does not relax any control requirements previously approved as part of the California SIP and thus does not represent ''backsliding'' in that sense.[60] Also, by definition, contingency measures must be measures that go beyond the measures that provide for RFP and attainment, and thus, approval of contingency measures would not interfere with either of those separate requirements.

Furthermore, the EPA evaluated the 2024 SJV Ozone Contingency Measure Plan specifically with respect to the SIP requirements for contingency measures under CAA sections 172(c)(9) and 182(c)(9) and, for the reasons given in

---

[57] 89 FR 56222, 56224–56225 (July 9, 2024); and Final Revised Contingency Measures Guidance, p. 47.

[58] Id.

[59] The District's Architectural Coatings Contingency Measure is fully triggered upon a single triggering event (*i.e.* finding of failure to meet an RFP milestone or failure to attain by the applicable attainment date) that relates solely to the 2008 ozone NAAQS. See section 4.3 of District Rule 4601. In contrast, CARB's Smog Check Contingency Measure accommodates two triggering events and has been triggered by a determination by the EPA that the San Joaquin Valley failed to attain the 1997 ozone NAAQS by the applicable attainment date. However, because the Smog Check Contingency Measure provides for a second triggering event, it remains a viable contingency measure for the 2008 ozone NAAQS. See p. 3 of the Smog Check Contingency Measure (included as Appendix B of the 2024 SJV Ozone Contingency Measure Plan).

[60] To the extent that the commenters assert that the EPA approved an emissions level that contingency measures in the San Joaquin Valley for the 2008 ozone NAAQS must achieve when we approved the contingency measure element in 2019, and that we are now approving a SIP revision that establishes a lower emissions level, we note that we withdrew our 2019 conditional approval of the contingency measure element for San Joaquin Valley for the 2008 ozone NAAQS with the exception of the Enhanced Enforcement Activities Program measure at 87 FR 59688 (October 3, 2022).

the proposed rule, preliminarily determined that the 2024 SJV Ozone Contingency Measure Plan, considered together with the two existing contingency measures and the five additional contingency measures to which the District and CARB have committed, meets those requirements. As such, approval of the 2024 SJV Ozone Contingency Measure Plan would not interfere with the applicable contingency measure requirement. The commenters do not identify any other applicable CAA requirements implicated by the EPA's proposed conditional approval of the 2024 SJV Ozone Contingency Measure Plan.

*Comment 8:* The Valley Environmental Organizations contend that the EPA unlawfully and arbitrarily proposed to approve the 2024 SJV Ozone Contingency Measure Plan based on a 2012 base year emissions inventory, whereas 2011 is the approved RFP baseline year that was the basis for the EPA's 2019 approval of the contingency measure element. The Valley Environmental Organizations view the EPA's proposed approval as shifting the baseline year for contingency measures from 2011 to 2012 and assert that the EPA fails to explain why this change in the baseline inventory for the purposes of contingency measures is more consistent with the Act or with *South Coast Air Quality Management District* v. *EPA,* 882 F.3d 1138 (D.C. Cir. 2018).[61]

*Response to Comment 8:* The 2024 SJV Ozone Contingency Measure Plan uses the 2012 base year emission inventory and the attainment year emissions inventory to calculate OYW of progress, the amount of emissions reductions that EPA recommends that states achieve to meet the contingency measure SIP requirement.[62] This approach is consistent with the corresponding recommendations in the EPA's Revised Contingency Measures Guidance.

In 2019, when the EPA first approved (conditionally) the contingency measure element for the 2008 ozone NAAQS for San Joaquin Valley, the EPA was

recommending that states adopt contingency measures that provide the equivalent of OYW of RFP.[63] With respect to the 2008 ozone NAAQS, as commenters note, OYW of RFP is three percent of the 2011 VOC RFP baseline emissions inventory. In 2022, the EPA withdrew its 2019 (conditional) approval of the contingency measure element for the 2008 ozone NAAQS for San Joaquin Valley, with the exception of the Enhanced Enforcement Activities Program measure.[64]

The change in the baseline inventory used to determine the amount of emissions reductions that contingency measures should achieve for San Joaquin Valley for the 2008 ozone NAAQS reflects the change in EPA guidance on contingency measures. CARB and the District prepared the original contingency measure element (now withdrawn) in light of EPA guidance available at that time (and that recommended that contingency measures achieve OYW of RFP), and CARB and the District prepared the 2024 SJV Ozone Contingency Measure Plan in light of the Revised Contingency Measures Guidance (that recommends that contingency measures achieve OYW of progress). We discuss why we believe the new approach to the recommended amount of emissions reductions that contingency measures should achieve is the best reading of the CAA in Response to Comment 1.

Lastly, we note that the *South Coast Air Quality Management District* v. *EPA* decision cited by commenters does not speak to the contingency measure SIP requirements under CAA sections 172(c)(9) and 182(c)(9), which are the relevant statutory provisions for the EPA's review and evaluation of the 2024 SJV Ozone Contingency Measure Plan, and thus there is no need to discuss the consistency between our action and that particular court decision.

*Comment 9:* The Valley Environmental Organizations state that the EPA's proposed approval of the State's contingency measures ignores Presidential orders that direct the EPA and other federal agencies to prioritize environmental justice, including Executive Order 14008, ''Tackling the Climate Crisis at Home and Abroad,'' (January 27, 2021) and Executive Order 14096, ''Revitalizing our Nation's Commitment to Environmental Justice for All'' (April 21, 2023).[65] They further argue that the EPA exacerbates the

''environmental justice crisis'' by denying the residents of the San Joaquin Valley meaningful pollution reductions that should happen upon a failure to attain the 2008 ozone NAAQS. To convey the magnitude of this concern, the commenters cite to American Lung Association rankings of counties for ozone pollution (where many San Joaquin Valley counties rank among the worst in the nation) and the EPA's review of environmental justice indices (where many San Joaquin Valley counties exceed the 90th percentile) and describe the sequence of failures to attain the NAAQS by the applicable attainment dates in San Joaquin Valley, as well as recent air quality design values for the 1997 and 2008 ozone NAAQS that portend the same. Lastly, they contend that the EPA's statement in the proposed rule that the action is expected to have a neutral to positive impact on the air quality of the affected area lacks credulity because the EPA is proposing to approve a weakening of its contingency measures interpretation and lacks factual support.

*Response to Comment 9:* Executive Orders 14008 and 14096 were rescinded on January 20, 2025.[66] In the proposed rule, we indicated that the action is expected to have a neutral to positive impact because the approved ozone contingency measures, including the Architectural Coatings Contingency Measure and the Smog Check Contingency Measure, and the additional contingency measures to which the District and CARB have committed to adopt and submit would, following a triggering event, reduce emissions from various VOC sources and light-duty vehicles across the San Joaquin Valley. These reductions would contribute to reduced negative environmental and health impacts on all populations in the San Joaquin Valley.

To the extent that the commenters disagree with the EPA's Revised Contingency Measures Guidance or our application of the guidance to the facts and circumstances of the San Joaquin Valley, we maintain that the 2024 SJV Contingency Measure Plan, including the related commitments to adopt additional contingency measures and infeasibility demonstrations for further contingency measures, considered together with the two existing and approved ozone contingency measures, meets the contingency measure SIP requirements of CAA sections 172(c)(9) and 182(c)(9). Under the CAA, the EPA is required to approve a SIP submission

---

[61] The 2008 Ozone SIP Requirement Rule (SRR) requires the RFP baseline year to be the most recent calendar year for which a complete triennial inventory was required to be submitted to the EPA. For the purposes of developing RFP demonstrations for the 2008 ozone standards, the applicable triennial inventory year is 2011. The 2008 Ozone SRR provided states with the opportunity to use an alternative baseline year for RFP but that particular aspect of the 2008 Ozone SRR was vacated by the D.C. Circuit in the *South Coast Air Quality Management District* v. *EPA* decision cited by the commenters.

[62] 2024 SJV Ozone Contingency Measure Plan, pp. 6–7.

[63] 84 FR 11198, at 11205 (March 25, 2019).

[64] 87 FR 59688 (October 3, 2022).

[65] Valley Environmental Organizations Comment Letter, pp. 4–6. See also, 86 FR 7619 (February 1, 2021) (Executive Order 14008) and 88 FR 25251 (April 26, 2023) (Executive Order 14096).

[66] Executive Order 14148 (January 20, 2025). See 90 FR 8237 (January 28, 2025).

that meets the requirements of the CAA and applicable federal regulations.

*Comment 10:* The Valley Environmental Organizations allege that, following the 2021 Ninth Circuit Court decision in *AIR* v. *EPA,* the EPA began to work with CARB and California air districts to weaken the contingency measure requirement. The Valley Environmental Organizations further state that, during meetings of a workgroup called the ''Padilla Contingency Measures Subgroup,'' the EPA committed to revise its long-standing interpretation of the contingency measure requirements, including specific elements that would relax emissions reduction requirements, and contend that the EPA's commitment led to the Revised Contingency Measures Guidance.[67] The commenters also contend that the EPA now proposes, as it allegedly agreed to during the Padilla Contingency Measures subgroup proceedings, to ''eviscerate the amount of emissions reductions such measures should provide'' and that the ''EPA has predetermined the outcome of these proposed rulemakings in an agreement with CARB and the air districts during the Padilla Contingency Measures Subgroup proceedings,'' thereby violating the procedural due process clause of the Fifth Amendment to the U.S. Constitution, CAA section 307, the Administrative Procedure Act, and Executive Orders 14008 and 14096.[68]

The Valley Environmental Organizations include several documents obtained from the EPA via a Freedom of Information Act request to support their allegation of improper consultation and coordination.[69] These include, among other things, documents relating to EPA engagement in 2021–2023 with the California Air Pollution Control Officers Association (CAPCOA), the ''Padilla Contingency Measures Subgroup,'' a letter from South Coast Air Quality Management District, discussions with California air districts and CARB senior staff, and an email from EPA Region IX to the SJVUAPCD. The commenters state that these documents indicate that the EPA worked closely with California air agencies to fashion an agreement to weaken the contingency measure requirement and that the EPA shared its revised guidance with the California agencies several months before releasing the revised guidance to the general

public without regard for the public health consequences from weakening the contingency measure requirement.[70]

*Response to Comment 10:* We disagree that the EPA improperly communicated with California air agencies to reconsider the contingency measure requirement following the 2021 *AIR* v. *EPA* decision by the Ninth Circuit Court of Appeals, and we disagree that the EPA reconsidered the contingency measure requirement for the purpose of weakening it.

The CAA is referred to as a model of cooperative federalism. Under the CAA, the EPA is responsible for establishing the NAAQS, and the states are responsible for developing SIPs and SIP revisions to provide for implementation, maintenance, and enforcement of the NAAQS. In turn, the EPA is responsible for promulgating regulations establishing SIP requirements and for providing guidance to the states in developing SIPs and SIP revisions to meet the various requirements under the CAA and our implementing regulations.

In that capacity, it is appropriate for the EPA to reconsider previously-issued guidance in the wake of court decisions that bear on EPA actions on SIPs that relied on that guidance.[71] In this instance, as discussed in the Revised Contingency Measures Guidance, we issued the revised guidance document because recent court decisions had invalidated key aspects of EPA's historical approach to implementing the contingency measure requirement, and these court decisions had the effect of prohibiting an approach that many air agencies have historically used to meet the contingency measure requirement.[72]

The EPA developed the Revised Contingency Measures Guidance based on the recommendations of an ad hoc internal working group, referred to as the Contingency Measure Task Force, that the EPA assembled soon after the D.C. Circuit Court of Appeals decision in *Sierra Club* v. *EPA.*[73] The

Contingency Measure Task Force was composed of EPA program staff and attorneys from both the EPA regions and headquarters. During the process of preparing the Revised Contingency Measures Guidance, California air agencies made their views known to the EPA, but those agencies played no part in the drafting or review of the recommendations made by the Contingency Measure Task Force to EPA management or the substance of the Revised Contingency Measures Guidance itself.

Also in the spirit of cooperative federalism, the EPA routinely communicates with state and local air agencies responsible for SIPs and SIP revisions regarding compliance with SIP requirements. Again, the states are responsible for adoption and submission of SIPs and SIP revisions and there are consequences for failure to meet SIP submission deadlines.

In this instance, the EPA engaged with state and local air agencies to hear their concerns about meeting the contingency measure SIP requirements and to provide a description of the types of revisions to the contingency measures guidance that EPA staff were developing for consideration by EPA management. The impetus for heightened interest on the part of state and local air agencies was the need to meet near-term deadlines for submission of SIP revisions addressing the contingency measure SIP requirements for multiple ozone and PM$_{2.5}$ NAAQS. Documents cited by the commenter as evidence of improper coordination simply reveal that the EPA was responsive to state and local agency requests for insight as to what the contingency measures guidance revisions might entail if and when approved by EPA management. Thus the air agencies that developed SIP revisions in reliance on the descriptions by EPA staff of not-yet-approved revisions to the contingency measures guidance were taking a risk that the guidance, once made publicly available, would differ in material ways from what EPA staff had described.

With respect to the commitments that the EPA made in connection with the Padilla Contingency Measures Subgroup,[74] the EPA did not commit to

---

[67] Valley Environmental Organizations Comment Letter, p. 2.

[68] Valley Environmental Organizations Comment Letter, pp. 2 and 11.

[69] Valley Environmental Organizations Comment Letter, Exhibits 3 through 12.

[70] Valley Environmental Organizations Comment Letter, pp. 8–11.

[71] See, for example, EPA Office of Transportation and Air Quality, ''Implementing Clean Air Act Section 182(d)(1)(A): Transportation Control Measures and Transportation Control Strategies to Offset Growth in Emissions Due to Growth in Vehicle Miles Travelled,'' EPA–420–B–12–053, August 2012 (revised guidance in light of the Ninth Circuit Court of Appeals decision in *Association of Irritated Residents* v. *EPA,* 632 F.3d 584, at 596–597 (9th Cir. 2011), reprinted as amended on January 27, 2012).

[72] Draft Revised Contingency Measures Guidance, p. 2. See also the EPA's Final Revised Contingency Measures Guidance, p. 2.

[73] The *Sierra Club* v. *EPA* decision adopted the rationale of an earlier decision by the Ninth Circuit Court of Appeals in *Bahr* v. *EPA* that invalidated already-implemented measures as contingency

---

measures for the purposes of CAA section 172(c)(9). *Sierra Club* v. *EPA,* 21 F.4th 815, 827–28 (D.C. Cir. 2021) and *Bahr* v. *EPA,* 836 F.3d 1218 (9th Cir. 2016).

[74] The Padilla Contingency Measures Subgroup was one of several such ad hoc groups assembled in response to an inquiry from U.S. Senator Padilla. See the letter dated December 3, 2021, from Joseph Goffman, Principal Deputy Assistant Administrator to U.S. Senator Alex Padilla, responding to letter dated October 19, 2021, from U.S. Senator Alex Padilla to Michael Regan, Administrator, EPA.

making any specific revisions to the contingency measures guidance or to making any revisions to the guidance that are inconsistent with the CAA or case law. Rather, the Agency committed "to explore interpretations and approaches that are consistent with the court decisions" and, among other things, "to revisit" the general bases for calculating the amount of emission reductions that contingency measures should provide,[75] but as noted previously, the EPA did not commit to any particular outcome. The Contingency Measure Task Force followed through on these commitments through meetings and review of draft documents that were internal to the EPA and eventual publication of notice in the **Federal Register** of the availability of the Draft Revised Contingency Measures Guidance for public review and comment. We believe the revised draft guidance provides an approach that state and local air agencies may use to meet the contingency measure SIP requirements under the CAA.

The EPA issued the Draft Revised Contingency Measures Guidance on March 17, 2023, and sought public comment on section 3 ("Showing that the CMs Achieve Sufficient Reductions"), section 4 ("Reasoned Justification for Less Than OYW of Progress"), and section 5 ("Guidance on Timing of Reductions from CMs") of the draft guidance over a 30-day period ending April 24, 2023.[76] We applied the underlying concepts of the draft guidance in our evaluation of the 2024 SJV Ozone Contingency Measure Plan, described as much in our proposed rule, and provided a 30-day comment period ending November 25, 2024, consistent with the public notice requirements of the CAA and the Administrative Procedure Act.[77]

For this action, we considered the sum of the emissions reductions from the two approved ozone contingency measures (the District's Architectural Coatings Contingency Measure and CARB's Smog Check Contingency Measure) relative to the recommended amount we have indicated contingency measures should achieve. Because the measures, considered together, would not achieve the recommended amount of emissions reductions for VOC or

NO$_X$, CARB and the District submitted infeasibility demonstrations documenting the unavailability of additional feasible contingency measures for those ozone precursors.

We reviewed and evaluated the infeasibility demonstrations and, in our proposed rule, provided the rationale for our preliminary conclusion that the approved contingency measures, considered together with the commitments made by the District and CARB for five additional contingency measures, meet the applicable requirements for such measures and that CARB and the District had provided a reasoned justification, through the infeasibility demonstrations, for not adopting contingency measures sufficient to achieve the recommended amount of emission reductions for VOC and NO$_X$.

In this action, we are finalizing our approval of the 2024 SJV Ozone Contingency Measure Plan for the reasons given in the proposed rule, as clarified and supplemented in responses to comments. While the Valley Environmental Organizations object to the consideration of feasibility in connection with the contingency measure SIP requirement, the commenters have raised no specific objection to our evaluation of the infeasibility demonstrations from CARB and the District upon which our final approval rests, with the exception of our evaluation of the District's infeasibility demonstration for confined animal facilities. We address the comment related to confined animal facilities in the following response.

In summary, in our proposed rule on the State's contingency measure SIP submission for the 2008 ozone NAAQS in the San Joaquin Valley, as well as our Revised Contingency Measures Guidance, we articulated a reasoned justification for the change in EPA policy as to how states may comply with the contingency measure SIP requirements. We have responded in this document to comments opposing those policy changes, and we explained how we were reviewing the 2024 SJV Ozone Contingency Measure Plan in light of the new guidance. The EPA believes that such actions satisfy the applicable requirements for public process under the CAA and Administrative Procedure Act, as well as our responsibilities to engage state and local air agencies on CAA requirements, generally, and the development of SIP revisions in the wake of court decisions that bear on questions of CAA interpretation, specifically.

*Comment 11:* The Valley Environmental Organizations object to the EPA's approval of the infeasibility demonstration with respect to confined animal facilities. Citing information presented in the proposed rule, the commenters note the extent to which VOC emissions in San Joaquin Valley come from the farming operations source category and are associated with livestock husbandry, particularly silage at dairies and dairy cattle waste. Commenters contend that the District did not perform an economic or technological feasibility analysis of contingency measures from the source category. Rather, the commenters contend, because the District claims Rule 4570 is the most stringent rule in the nation, the District found that the District is currently implementing the most stringent feasible measure. The commenters further contend that the EPA fails to consider or explain whether contingency measures from a category that represents such a large percentage of the VOC emission in the Valley are not technologically or economically feasible. Further, they contend that, while Rule 4570 may be the only such rule in the country or the most stringent, that does not mean that additional emissions reductions are not feasible and that EPA's cursory dismissal of contingency measures for this category as infeasible is thus arbitrary and capricious.

*Response to Comment 11:* The EPA generally agrees with the commenters as to the extent to which the farming operations such as livestock husbandry, particularly silage and dairy cattle waste, contribute to Valley-wide VOC emissions inventories. We also agree that the District's conclusion that there are no feasible contingency measures for confined animal facilities, with which we proposed to agree in our proposed rule, rests on the contention that the District's rule that applies to this source category, Rule 4570 (Confined Animal Facilities), contains, as a practical matter, the most stringent requirements of any analogous air pollution control rules.[78]

While we believe that the fact that a rule is the most stringent measure for a given source category is an indicator that additional controls may not be feasible, we agree that, in this instance, additional information and evaluation is warranted. Thus, we requested additional information and analysis from the District, and the District responded in a letter and attachment that we have evaluated and included in

---

[75] Email from Elizabeth Adams, Director, Air & Radiation Division, EPA Region IX, to Philip Fine, Bay Area Air Quality Management District, March 29, 2023, and attachment titled "Padilla Subgroup Focus Area Summaries." The Valley Environmental Organizations included this email and attachment with their comment letter and identified it as Exhibit 7.

[76] 88 FR 17571 (March 23, 2023).

[77] 89 FR 85119 (October 25, 2024).

[78] 2024 SJV Ozone Contingency Measure Plan, pp. 79–80; 89 FR 85119, at 85133.

**33632** **Federal Register**/Vol. 91, No. 107/Thursday, June 4, 2026/Rules and Regulations

the docket for this rulemaking.[79] Herein, we refer to the letter and attachment collectively as the ''Confined Animal Facilities Supplement.''

In the Confined Animal Facilities Supplement, the District first discusses Rule 4570's menu-based approach, where CAF operators must select from a limited menu of mitigation measures. The District contends that the menu-based approach is necessary because CAFs in the San Joaquin Valley vary significantly compared to traditional industrial sources.[80] As a result, it is not feasible for all operators to implement identical mitigation measures given the differences in infrastructure, climate, permitting requirements, water availability and water board regulations, production contracts, and other limitations. Furthermore, the District reasons that requiring all measures from the menu would be duplicative and would not result in additional emissions reductions, as the measures control emissions through the same mechanisms. The EPA concurs with the District's menu-based approach for this source category and agrees that requiring implementation of additional mitigation measures from the menu in Rule 4570 as a contingency measure would be duplicative and would not result in increased emissions reductions.

The District then discusses the feasibility of Class Two Mitigation Measures from the pre-2010 version of Rule 4570 as contingency measures. The District explains that Class Two mitigation measures referred to practices that could potentially achieve emissions reductions equal to or greater than those achieved by Class One mitigation measures and were originally included in Rule 4570 to encourage CAF operators to go beyond the basic rule requirements and implement innovative practices to further reduce emissions.[81] However, the District notes that many of the Class Two Mitigation Measures were theoretical measures that had not been demonstrated in practice at CAFs. The District points to its previous evaluation of these Class Two Mitigation Measures in its ''2010 Final Staff Report for the Revised Proposed Amendments to Rule 4570,''[82] where the Class Two

Mitigation Measures were found to be technologically or economically infeasible and subsequently removed from Rule 4570. The District highlights the specific example of venting silage to a control device as a Class Two Mitigation Measure found to be infeasible and explains that it is infeasible because active venting introduces air into the silage, whereas silage preservation requires anaerobic conditions.[83]

The next step in the District's analysis was to evaluate the feasibility of adopting certain specific additional mitigation measures as contingency measures in Rule 4570. The District evaluated mitigation measure categories applicable to the San Joaquin Valley, including litter amendments and additives, biofilters, wet scrubbers, anaerobic digestion, injection of liquid and slurry manure, reducing crude protein for beef cattle, reducing crude protein content for dairy cattle, and increased grazing time for dairy cattle. For each mitigation measure, the District evaluated the technological and economic feasibility to determine whether the measure would be feasible for adoption as a contingency measure.[84]

With respect to litter amendments and manure additives, the District separately analyzed acidifying amendments and additives for poultry litter, manure additives, and microbial additives.[85] With respect to acidifying amendments and additives for poultry litter, the District notes that emissions reductions from acidifying amendments and additives for poultry litter have not been quantified in regard to VOC. Furthermore, the District contends that many additives to litter and manure require approval from the CA Regional Water Quality Control Board (RWQCB), may not be allowed, or may be toxic to handle.[86] The District then performed an economic analysis of using aluminum sulfate, commonly referred to as ''alum,'' as an additive to reduce VOC from poultry litter. Based on this analysis, the District concludes that it is not viable to adopt the measure as a contingency requirement to reduce VOC emissions. For manure additives for liquid and slurry manure, the District

states that the measure is infeasible due to pH, hydrogen sulfide emissions, and salinity concerns. The District contends that microbial additives are not feasible or practical for operations in the Valley. Citing a study by the National Hog Farmer,[87] the District contends that the effectiveness of microbial manure additives for VOC emissions reduction remains unproven.[88]

When a biofilter is used, exhaust air containing pollutants passes through media that contain an established, diverse population of aerobic microorganisms that oxidize organic contaminants, ammonia, and sulfur compounds. Biofilters have been successfully used to control odors and emissions from industrial sources, and the ''Agricultural Air Quality Conservation Measures, Reference Guide for Poultry and Livestock Systems'' (''USDA Reference Guide'') identifies biofilters as a potential method to control VOC emissions at CAFs.[89] However, the USDA Reference Guide also notes several considerations that must be taken into account when using biofilters to control emissions from CAFs, including the substantial costs involved. The District has evaluated the potential for greater use of biofilters to reduce VOC emissions from CAFs but finds that using biofilters to treat all the exhaust air from CAFs in the San Joaquin Valley is impractical due to the size of the biofilters that would be needed, the energy required to overcome the airflow resistance they create, and the airflow required to cool the enclosed spaces effectively.[90] The District also notes certain other practical difficulties, particularly in connection with biofilter maintenance. In light of all of these considerations, the District concludes that requiring the installation and use of biofilters as a contingency measure to control VOC emissions at CAFs is not feasible.

Wet scrubbers are capable of reducing particulate matter and gas emissions from animal production houses that are mechanically ventilated by physically trapping the particulate matter on wet surfaces and absorbing gases into a liquid. Many of the same technical difficulties posed by installation and maintenance of biofilters at CAFs also

[79] Letter dated January 30, 2026, from Matthew Lakin, Chief, Air Quality Planning and Science Division, CARB, to Anita Lee, Acting Director, Air & Radiation Divison, EPA Region IX with the following attachment: ''Technical Clarification and Additional Information for the 1997, 2008, and 2015 8-Hour Ozone NAAQS Contingency Measures.''

[80] Confined Animal Facilities Supplement, p. 3.

[81] Confined Animal Facilities Supplement, p. 4.

[82] SJVAPCD. San Joaquin Valley Air Pollution Control District Final Staff Report for the Revised

Proposed Amendments to Rule 4570, (October 21, 2010). Retrieved from: *https://ww2.valleyair.org/ media/ytbe5gaj/agenda_item_7_oct_21_2010.pdf* and included in the docket for this rulemaking.

[83] Confined Animal Facilities Supplement, p. 5.

[84] Confined Animal Facilities Supplement, pp. 5–22.

[85] Confined Animal Facilities Supplement, pp. 6–11.

[86] Confined Animal Facilities Supplement, pp. 7–8.

[87] National Hog Farmer. Evaluating Manure Additives for Odor Mitigation. (February 2, 2021) Retrieved from: *https://www.national hogfarmer.com/manure/evaluating-manure-additives-forodor-mitigation* and included in the docket for this rulemaking.

[88] Confined Animal Facilities Supplement, p. 10.

[89] USDA and EPA, Agricultural Air Quality Conservation Measures Reference Guide for Poultry and Livestock Production Systems. (September 2017).

[90] Confined Animal Facilities Supplement, p. 12.

apply to installation and maintenance of wet scrubbers at CAFs. Specifically, the District notes that, similar to biofilters, the practicality of scrubbers is limited as a result of their potential to compromise the ventilation airflow rate needed to control temperature in production houses and ensure animal health.[91] Citing the USDA Reference Guide, the District finds that a high air flow rate in the summer, animal housing differences, ongoing maintenance, and water demand make this mitigation measure infeasible.[92] Additionally, the District notes that they previously demonstrated the economic infeasibility of using wet scrubbers to control emissions from CAFs in the District's ''Ammonia: Supplemental Information for EPA in Support of 15 μg/m³ annual PM$_{2.5}$ Standard, Appendix B'' (''Ammonia Technical Supplement'').[93]

Anaerobic digesters are systems that break down manure in oxygen-free tanks to produce biogas. In the process of anaerobic digestion, most of the VOC compounds in the substrate are converted to methane, carbon dioxide, and water. The District reports that the California Department of Food and Agriculture (CDFA) has funded the installation of anaerobic digesters at certain dairy CAFs in the Valley. The District notes that a significant obstacle to wider installation and use of anaerobic digesters at CAFs is the high initial and ongoing maintenance costs. The District cites a CDFA reference for the figure of $7.5 million as the average cost for dairy digester projects in California.[94] As such, the District concludes that installation of additional anaerobic digesters in the San Joaquin Valley as a contingency measure is economically infeasible without a stable funding source.[95]

Injection of liquid or slurry manure is generally accepted as a method to reduce emissions relative to traditional surface broadcasting. However, the District notes that nearly all liquid manure in the San Joaquin Valley is already diluted and applied via surface gravity irrigation systems, such as flood and furrow irrigation. The District further notes that this application method reduces emissions because the diluted liquid manure has much lower concentration of VOCs, and liquid manure in furrow and flood irrigation systems emits significantly less VOCs compared to broadcasting.[96] Furthermore, the District contends that no research has quantified VOC emissions reductions from different methods of land application of manure. Finally, the District notes that to avoid damaging growing crops and to protect water quality, farmers must restrict the frequency, timing, and amount of nitrogen that they can apply to cropland in certain portions of the San Joaquin Valley.[97] Such restrictions further reduce the potential of injection of liquid or slurry manure for adoption as a contingency measure in the San Joaquin Valley.

Reducing the crude protein content for beef and dairy cattle feed has been evaluated as potential measures to reduce ammonia emissions during certain phases of beef and dairy production, and for that reason, the District has evaluated them as potential contingency measures for VOC. The District notes that the potential VOC reductions from these measures have not been quantified, and achievable reductions are uncertain.[98] For beef cattle, the District notes that reducing the crude protein content of the feed as a means of reducing ammonia has only been tested for the finishing cycle of beef cattle lives, and that there are limited opportunities to implement this measure as there are very few finishing cycle feeder beef cattle in the San Joaquin Valley.[99] Furthermore, the District notes that there may be no net reduction in VOC emissions over the life of the cattle because any VOC reductions from reducing the crude protein content of beef cattle feed may be offset due to the longer time necessary to reach market weight.[100]

For dairy cattle, the District notes significant gaps in knowledge of what would occur if crude protein were reduced in dairy cattle, specifically in the San Joaquin Valley. Higher levels of milk production require higher levels of protein, so reducing the crude protein content of feed will probably reduce milk yields.[101] Citing communications with Dr. Peter Robinson, University of California at Davis Extension Specialist, Dairy Cattle Nutritional Management Department of Animal Science, the District contends that lowering crude protein below required levels results in an immediate negative impact on milk production.[102] The District reasoned, for both of these measures, it is not feasible to adopt the measures as contingency requirements, given the remaining uncertainties about VOC emissions reductions, the impacts on milk production and animal health, and overall costs.[103]

Increasing the amount of time dairy cows spend grazing is considered a potential VOC mitigation measure because it could reduce ammonia emissions due to less silage consumption and may thus also reduce VOC emissions. Based on a number of assumptions for such parameters as the number of acres of pasture required to allow a mature dairy cow to graze per unit of time, the District estimates that 3.1 million acres of irrigated pasture would need to be available for dairy cows in the San Joaquin Valley to graze for the entire year. The land needed is significantly beyond that which is available. For this reason, the District concludes that increased grazing time for daily cattle is not viable to adopt as a contingency requirement to reduce VOC emissions.[104]

In summary, for all mitigation measures evaluated, the District did not identify any new measures capable of achieving VOC emissions reductions that are technologically and economically feasible. Based on our review of the supplemental analysis, we find that the District has evaluated an appropriate set of potential contingency measures for CAFs and presented a reasonable basis to conclude that the measures are not feasible for adoption as contingency measures at this time. Therefore, we continue to agree with the District's conclusion that there are no feasible contingency measures for this source category.

### III. EPA Action

For reasons provided in our October 25, 2024 proposed rule and in our responses to comments included in this document, we are taking final action under CAA section 110(k)(4) to conditionally approve the 2024 SJV Ozone Contingency Measure Plan as a revision of the California SIP as it pertains to the 2008 ozone NAAQS. We are doing so based on our determination

---

[91] Confined Animal Facilities Supplement, p. 13.

[92] Confined Animal Facilities Supplement, p. 14.

[93] Ammonia: Supplemental Information for EPA in Support of 15 μg/m3 annual PM$_{2.5}$ Standard, Appendix B. (March 2023). Retrieved from: *https://www.regulations.gov/document/EPA-R09-OAR-2023-0263-0114* and included in the docket for this rulemaking.

[94] Confined Animal Facilities Supplement, p. 15.

[95] Id.

[96] Confined Animal Facilities Supplement, p. 16.

[97] Id.

[98] Confined Animal Facilities Supplement, pp. 18–19.

[99] Confined Animal Facilities Supplement, p. 18.

[100] Journal of Animal Science. Effects of phase-feeding of crude protein on performance, carcass characteristics, serum urea nitrogen concentrations, and manure nitrogen of finishing beef steers (December 1, 2006).

[101] Confined Animal Facilities Supplement, pp. 19–20.

[102] University of California Agriculture and Natural Resources. Ecology and Management of Annual Rangelands Series Part 8: Grazing Management. (December 2020).

[103] Confined Animal Facilities Supplement, p. 20.

[104] Confined Animal Facilities Supplement, 22.

that, considered together with the existing approved contingency measures and the commitments to submit additional contingency measures, the 2024 SJV Ozone Contingency Measure Plan meets the contingency measure requirements of CAA sections 172(c)(9) and 182(c)(9) for the San Joaquin Valley for the 2008 ozone NAAQS. Thus, we find that the 2024 SJV Ozone Contingency Measure Plan, including the already adopted contingency measures and commitments, corrects the deficiencies in the previous contingency measure element submissions for San Joaquin Valley for the 2008 ozone NAAQS that we partially disapproved in October 2022.[105] Our approval is conditional because it relies on commitments by CARB and the District to supplement the 2024 SJV Ozone Contingency Measure Plan through submission of additional contingency measures within one year of final conditional approval.

## IV. Statutory and Executive Order Reviews

Under the CAA, the Administrator is required to approve a SIP submission that complies with the provisions of the Act and applicable federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, the EPA's role is to approve state choices, provided that they meet the criteria of the CAA. Accordingly, this action merely takes action to conditionally approve a state plan as meeting federal requirements and does not impose additional requirements beyond those imposed by state law. For that reason, this action:

• Is not a significant regulatory action subject to review by the Office of Management and Budget under

[105] In the same issue of the **Federal Register** that we published the proposed rule, we issued an interim final determination to stay application of the offset sanction and defer application of the highway sanction that were triggered by the EPA's October 3, 2022 partial disapproval of SIP revisions submitted to address the contingency measure requirements for the 2008 ozone NAAQS for the San Joaquin Valley. 89 FR 85064 (October 25, 2024). All sanctions and any sanctions clocks associated with the October 3, 2022 partial disapproval will continue to be stayed or deferred unless and until the EPA proposes to or takes final action to convert the conditional approval of the 2024 SJV Ozone Contingency Measure Plan to a disapproval. See 40 CFR 52.31(d)(2)(ii) and CAA section 110(k)(4).

Executive Order 12866 (58 FR 51735, October 4, 1993);

• Is not an Executive Order 14192 (90 FR 9065, February 6, 2025) regulatory action because this action is not significant under Executive Order 12866;

• Does not impose an information collection burden under the provisions of the Paperwork Reduction Act (44 U.S.C. 3501 *et seq.*);

• Is certified as not having a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*);

• Does not contain any unfunded mandate or significantly or uniquely affect small governments, as described in the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4);

• Does not have federalism implications as specified in Executive Order 13132 (64 FR 43255, August 10, 1999);

• Is not subject to Executive Order 13045 (62 FR 19885, April 23, 1997) because it approves a state program;

• Is not a significant regulatory action subject to Executive Order 13211 (66 FR 28355, May 22, 2001); and

• Is not subject to requirements of Section 12(d) of the National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) because application of those requirements would be inconsistent with the CAA.

In addition, the SIP is not approved to apply on any Indian reservation land or in any other area where the EPA or an Indian Tribe has demonstrated that a Tribe has jurisdiction. In those areas of Indian country, the final rule does not have Tribal implications and will not impose substantial direct costs on Tribal governments or preempt Tribal law as specified by Executive Order 13175 (65 FR 67249, November 9, 2000).

This action is subject to the Congressional Review Act, and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2).

Under section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by August 3, 2026. Filing a petition for reconsideration by the

Administrator of this final rule does not affect the finality of this action for the purposes of judicial review, nor does it extend the time within which a petition for judicial review may be filed, and it shall not postpone the effectiveness of such rule or action. This action may not be challenged later in proceedings to enforce its requirements. (See section 307(b)(2).)

## List of Subjects in 40 CFR Part 52

Environmental protection, Air pollution control, Incorporation by reference, Intergovernmental relations, Nitrogen oxides, Ozone, Reporting and recordkeeping requirements, Volatile organic compounds.

Dated: May 22, 2026.

**Michael Martucci,**

*Acting Regional Administrator, Region IX.*

For the reasons discussed in the preamble, the EPA amends 40 CFR part 52 as follows:

## PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS

■ 1. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

## Subpart F—California

■ 2. In § 52.220a, in paragraph (e), amend table 8 by adding an entry for ''Ozone Contingency Measure State Implementation Plan Revision for the 2008 and 2015 8-hour Ozone Standards (April 25, 2024)'' after the entry for ''SJVUAPCD's commitments to adopt, submit, and implement substitute rules that will achieve equivalent reductions in emissions of direct $PM_{2.5}$ or $PM_{2.5}$ precursors in the same adoption and implementation timeframes or in the timeframes needed to meet CAA milestones, as stated on p. 4 of San Joaquin Valley Unified APCD Resolution 2012–12–19, dated December 20, 2012 were revised by California Air Resources Board Resolution 20–15, dated May 28, 2020, in paragraph (c)(539)(ii)(A)(2) of this section'' to read as follows:

## § 52.220a  Identification of plan—in part.

\*    \*    \*    \*    \*

(e) \* \* \*

TABLE 8—SAN JOAQUIN VALLEY AIR BASIN

| Name of SIP provision | Applicable geographic area | State submittal date | EPA approval date | Explanation |
|---|---|---|---|---|
| * * | * | * | * | * * |
| Ozone Contingency Measure State Implementation Plan Revision for the 2008 and 2015 8-hour Ozone Standards (April 25, 2024). | San Joaquin Valley. | April 29, 2024 ..... | June 4, 2026, 91 FR [INSERT **FEDERAL REGISTER** PAGE WHERE THE DOCUMENT BEGINS]. | Approval pertains to the 2008 ozone NAAQS. Submitted electronically on April 29, 2024, as an attachment to a letter dated April 26, 2024. |
| * * | * | * | * | * * |

*    *    *    *    *

■ 3. Amend § 52.248 by adding paragraph (o) to read as follows:

**§ 52.248   Identification of plan—conditional approval.**

*    *    *    *    *

(o) The EPA is conditionally approving the California State Implementation Plan (SIP) for San Joaquin Valley for the 2008 ozone NAAQS with respect to the contingency measure requirements of CAA sections 172(c)(9) and 182(c)(9). The conditional approval is based on commitments included in a letter from the San Joaquin Valley Unified Air Pollution Control District (District) dated June 18, 2024 from Samir Sheikh, Executive Director/Air Pollution Control Officer, District, to Dr. Steven S. Cliff, Executive Officer, CARB and Martha Guzman, Regional Administrator, EPA Region IX, to adopt certain rule revisions, and commitments included in a letter from the California Air Resources Board (CARB) dated June 24, 2024 from Michael Benjamin, D. Env., Division Chief, Air Quality Planning & Science Division, CARB, to Martha Guzman, Regional Administrator, EPA Region IX, to submit the amended rules to the EPA within 12 months of the effective date of the final conditional approval. If the District or CARB fail to meet their commitments within one year of the effective date of the final conditional approval, the conditional approval is treated as a disapproval.

[FR Doc. 2026–11168 Filed 6–3–26; 8:45 am]

**BILLING CODE 6560–50–P**

**DEPARTMENT OF TRANSPORTATION**

**Maritime Administration**

**46 CFR Part 355**

**[Docket Number MARAD–2025–0087]**

**RIN 2133–AB90**

**Establishing United States Citizenship for MARAD Program Participation; Simplifying the Application Process**

**AGENCY:** Maritime Administration (MARAD), U.S. Department of Transportation (DOT).

**ACTION:** Final rule.

**SUMMARY:** On July 1, 2025, MARAD published a Notice of Proposed Rulemaking (NPRM), titled ''How to Best Evidence Corporate Citizenship: Policy and Regulatory Review,'' soliciting public comment on actions MARAD could take to improve the process for evidencing U.S. citizenship. The final rule will simplify and modernize the process for establishing United States citizenship of corporations and other business formations participating in MARAD programs. In the interest of minimizing the unnecessary disclosure of personally identifiable information, the final rule will also eliminate the requirement to provide dates and places of birth of corporate executives, directors, and stock owners as required in the current form of affidavit of citizenship. The final rule will also amend the form of affidavit with respect to entities that are publicly traded by eliminating the requirement to provide certain information regarding registered owners of stock, eliminate the notarization requirement, and provide a simple and streamlined process for recertification.

**DATES:** This final rule is effective on June 4, 2026.

**FOR FURTHER INFORMATION CONTACT:** Michael C. Pucci, Office of the Chief Counsel, Division of Maritime Programs, (202) 366–5167 or via email at *Michael.Pucci@dot.gov.* Persons who use a telecommunications device for the deaf (TDD) may call the Federal Information Relay Service (FIRS) at 1–800–877–8339 to contact the above individual during business hours. The FIRS is available twenty-four hours a day, seven days a week, to leave a message or question. You will receive a reply during normal business hours. You may send mail to U.S. Department of Transportation, Maritime Administration, Office of the Chief Counsel, Division of Legislation and Regulations, W24–220, 1200 New Jersey Avenue SE, Washington, DC 20590–0001.

**SUPPLEMENTARY INFORMATION:**

**Electronic Access and Filing**

This final rule and all comments may be viewed online through the Federal eRulemaking portal at *www.regulations.gov.* An electronic copy of this document may also be downloaded by accessing the Office of the Federal Register's home page at: *www.federalregister.gov.*

*Privacy Act:* Anyone can search the electronic form of all comments received into any of our dockets by the name of the individual submitting the comment (or signing the comment, if submitted on behalf of an association, business, labor union, etc.). For information on DOT's compliance with the Privacy Act, please visit *https://www.transportation.gov/privacy.*

**Background**

On July 1, 2025, MARAD published a Notice of Proposed Rulemaking (NPRM), titled ''How to Best Evidence Corporate Citizenship: Policy and Regulatory Review,'' soliciting public comment on actions MARAD could take to simplify and modernize the process for evidencing U.S. citizenship (90 FR 28513). Previously, on May 1, 2019, MARAD published an Advanced Notice of Proposed Rulemaking (ANPRM), titled ''How to Best Evidence Corporate Citizenship: Policy and Regulatory Review'' (84 FR 18468) soliciting public